David DUKE; Martha Andrews; William Gorton and Victor Manget, Plaintiffs–Appellants,

v.

Max CLELAND, Secretary of State of Georgia and Chair of the Presidential Candidate Selection Committee; Presidential Candidate Selection Committee and Alec Poitevint, Defendants–Appellees.

No. 92–8724.

United States Court of Appeals, Eleventh Circuit.

Oct. 29, 1993.

Moffatt Laughlin McDonald, Mary Wyckoff and Neil Bradley, American Civ. Liberties Union, Southern Regional Office, Gerald Weber, ACLU of Georgia, Inc., Atlanta, GA, for plaintiffs-appellants.

David J. Stewart, Oscar N. Persons, Alston & Bird, Dennis R. Dunn, Georgia Law Dept., Michael Hobbs, Asst. Atty. Gen., State Law Dept. of GA, Atlanta, GA, for defendants-appellees.

Before FAY and DUBINA, Circuit Judges, and GIBSON *, Senior Circuit Judge.

DUBINA, Circuit Judge:

The plaintiffs in this case are David Duke ("Duke"), a controversial political figure, and three Georgia voters (the "Voters"). Georgia's Secretary of State, Max Cleland ("Cleland"), its Republican party chairman, Alex Poitevint ("Poitevint"), and the Georgia presidential candidate selection committee (the "Committee"), are the defendants. Duke and the Voters filed suit after the Committee's Republican members, acting pursuant to power granted by state law, excluded Duke from a list of Republican candidates to be placed on Georgia's presidential primary election ballot. The plaintiffs claimed that the Committee's actions constituted an im-

proper use of state power. The district court granted the defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) and the plaintiffs appeal. We vacate and remand.

## I. FACTS

In December 1991 Cleland, acting as Secretary of State of Georgia, prepared and published a list of candidates for the upcoming 1992 presidential preference primaries per section 21–2–193(a) of the Georgia Code. Section 21–2–193 establishes the "presidential candidate selection committee" comprised of the Speaker of the House, the Senate majority leader, the minority leaders of both the House and the Senate, and the chairmen of the political parties. The Secretary of State is the nonvoting chairman.[1]

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. O.C.G.A. § 21–2–193 (1987) states in full:

(a) The name of any candidate for a political party or body nomination for the office of President of the United States shall be printed upon the ballot used in such primary upon the direction of a presidential candidate selection committee composed of a nonvoting chairman who shall be the Secretary of State and the Speaker of the House of Representatives, the majority leader of the Senate, the minority leaders of both the House and Senate, and the chairmen of the political parties and bodies who conduct a presidential preference primary pursuant to Code Section 21–2–191. The Secretary of State, during the first week in December of the year preceding the year in which a presidential preference primary is held, shall prepare and publish a list of names of potential presidential candidates who are generally advocated or recognized in news media throughout the United States as aspirants for that office and who are members of a political party or body which will conduct a presidential preference primary in this state; provided, however, that the Secretary of State shall not include on such list the name of any potential presidential candidate who, if elected to the office of President of the United States, would be ineligible under the Constitution and laws of the United States to serve in such elected office. The Secretary of State shall submit such list of names of potential presidential candidates to the selection committee during the second week in December of the year pre-

ceding the year in which a presidential preference primary is held. The selection committee shall meet in Atlanta during the third week in December of the year preceding the year in which a presidential preference primary is held, on a date publicly announced by the chairman. Each person designated by the Secretary of State as a presidential candidate shall appear upon the ballot of the appropriate political party or body unless all committee members of the same political party or body as the candidate agree to delete such candidate's name from the ballot. The selection committee shall publicly announce and submit the names of presidential candidates who shall appear on the presidential primary ballot to the Secretary of State no later than the end of the fourth week of December of the year preceding the year a presidential preference primary is held. Not later than January 1 of each year in which a presidential preference primary is held, the Secretary of State shall notify each potential presidential candidate designated by the committee for inclusion on the primary ballot. Such notification shall be in writing by registered or certified mail with return receipt requested.

(b) Any presidential candidate whose name is not selected by the Secretary of State or whose name is deleted by the selection committee may request, in writing, to the chairman of the selection committee, prior to January 6 of each year in which a presidential preference primary is held, that his name be placed on the ballot. Not earlier than January 6, nor later than January 10, the Secretary of State shall convene the committee to consider such requests; provided, however, that the committee

Pursuant to section 21–2–193 Cleland placed Duke on the list as a nationally recognized candidate for the 1992 Republican Party nomination for President of the United States.

When the Committee met, the three Republican members voted unanimously to remove Duke's name from the presidential preference primary ballot as authorized by section 21–2–193(a). Duke appealed his removal from the ballot pursuant to section 21–2–193(b) of the Georgia Code. The Committee met to hear the appeal, but no Republican member of the Committee voted to restore Duke's name to the ballot.

Duke and the Voters, who previously voted in Republican primaries and wished to have an opportunity to vote for Duke in the 1992 presidential preference primary, filed an action in federal district court against Cleland as Secretary of State and as chair of the Committee and against the Committee itself, seeking a temporary restraining order, preliminary injunction and permanent injunction under 42 U.S.C. § 1983 to prohibit the printing of ballots for the 1992 Georgia Republican presidential preference primary unless Duke was listed as a candidate. Plaintiffs claimed that the actions by the Committee and Cleland to exclude Duke from the Republican Party primary ballot deprived them of their right to free speech, right to association, right of equal protection, right to due process, right to run for office and right to vote in violation of the First and Fourteenth Amendments of the United States Constitution. Cleland opposed the requested relief. Poitevint, Georgia's Republican Party Chair, moved to intervene as a defendant.

The district court held a hearing and granted Poitevint's motion to intervene. In a written order, the district court denied the temporary restraining order and the preliminary injunction. *Duke v. Cleland,* 783 F.Supp. 600 (N.D.Ga.1992). We affirmed. *Duke v. Cleland,* 954 F.2d 1526 (11th Cir.),

*cert. denied,* —— U.S. ——, 112 S.Ct. 1152, 117 L.Ed.2d 279 (1992) [hereinafter *Duke I* ].

Plaintiffs then filed an amended complaint, reasserting the allegations in the first complaint and asserting an additional claim under 42 U.S.C. § 1983 that the Georgia presidential preference primary candidate selection statute violates their right of free speech, right of association, right to equal protection, right to run for office, right to vote and right of due process guaranteed by the First and Fourteenth Amendments of the Constitution of the United States. Cleland and Poitevint moved to dismiss the plaintiffs' amended complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the defendants' motions to dismiss on the grounds that there was no state action, plaintiffs' constitutional rights were not violated and the statute is constitutional. This appeal followed.

■■■ We review de novo the district court's dismissal of plaintiffs' complaint for failure to state a claim. *See Thomas v. Evans,* 880 F.2d 1235, 1239 (11th Cir.1989). We must take the complaint's allegations as true and read them in the light most favorable to the plaintiffs. *Linder v. Portocarrero,* 963 F.2d 332, 334 (11th Cir.1992). A complaint may not be dismissed unless the plaintiff can prove no set of facts entitling him to relief. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Pataula Electric Membership Corp. v. Whitworth,* 951 F.2d 1238, 1240 (11th Cir. 1992).

## II. ANALYSIS

■■■ Duke and the Voters contend that the district court misapplied Rule 12(b)(6) in dismissing their complaint. Specifically, they allege that the district court erred by finding (1) no state action and (2) that the statute did

---

shall not consider any request to ·place the name of any potential presidential candidate on the ballot if such potential presidential candidate, if elected to the office of President of the United States, would be ineligible. If any member of the selection committee of the same political party or body as the candidate re-

quests that such candidate's name be placed on the ballot, the committee shall direct the Secretary of State to place the candidate's name on the ballot. Within five days after such meeting, the Secretary of State shall notify the potential presidential candidate whether or not his name will appear on the ballot.

not violate Duke's and the Voters' constitutional rights.[2]

## A. State Action

It is well established that in any action brought under 42 U.S.C. § 1983 the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law, and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The panel in Duke I assumed *arguendo* that the actions of the Committee constituted state action for purposes of that lawsuit. The district court in this case held instead that the plaintiffs failed to allege a sufficient basis that the Committee's decision to exclude Duke was fairly attributable to the state. The district court examined the statute and concluded that it did not (1) involve the state in party member decisions, (2) delegate authority that the parties did not have already, or (3) mandate guidelines for the decision-making process. In essence, the district court—citing our decision in *Delgado v. Smith,* 861 F.2d 1489, 1496 (11th Cir.1988), *cert. denied,* 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989)—found that the statute preserves party autonomy, and thus does not constitute state action. We disagree.

The Committee is a creature of state law and its actions are attributable to the state. First, the state vests the initial power to include or exclude candidates in the Secretary of State. This seminal power of selection, conferred upon a high state official, is tempered only by the state's requirement that the candidates selected be generally rec-

ognized by the national media as aspirants for the presidency.[3] Second, the statute then confers upon the Committee the absolute power to decide who may run and who may not. The statute represents a scheme whereby the state confers largely upon itself the raw power to choose who may or may not be party primary candidates. Two-thirds of the Committee's voting members are elected officials representing their respective parties. No guidelines limit their power. The Committee may exclude nationally recognized candidates for any reason or no reason at all.

Party membership is no concern of the state. *Smith v. Allwright,* 321 U.S. 649, 664, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944); *see also Democratic Party of U.S. v. Wisconsin ex rel. Lafollette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981). An entity may, however, become "so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." *Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). When as here the state empowers its officials to exclude presidential aspirants from the presidential primary ballot, the power exercised is directly attributable to the state. *Allwright,* 321 U.S. at 664–65, 64 S.Ct. at 765–66. Indeed, the Committee performs a critical public function by limiting the electorate's voting choices to its preferred candidates only. *See id.*

That the Committee exercises judgment independent of the state does not necessarily negate state action. *See Terry v. Adams,* 345 U.S. 461, 469, 73 S.Ct. 809, 813, 97 L.Ed. 1152 (1953). The Committee acts in "matters of high public interest, matters intimately connected with the capacity of government to exercise its functions unbrokenly and smoothly." *Nixon v. Condon,* 286 U.S. 73, 88, 52 S.Ct. 484, 487, 76 L.Ed. 984 (1932). Its power to restrict ballot access flows di-

---

**2.** While this appeal was pending, we raised the issue of the plaintiffs' standing *sua sponte* and requested the parties to brief that issue. After studying those briefs and the cases cited therein, we determine that the plaintiffs indeed have standing in this case. *See Anderson v. Celebrezze,* 460 U.S. 780, 787, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983). Moreover, while the 1992 primary election is long over, the issues here are

capable of repetition while evading judicial review and therefore are not moot. *See Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974).

**3.** The parties do not contest that Duke was a nationally recognized Republican aspirant for the presidency.

rectly from the state *ab intitio. See All-wright*, 321 U.S. at 664, 64 S.Ct. at 765. The parties themselves do not select their primary candidates or retain ultimate responsibility for choosing those it seeks for representation. Indeed, the Committee's determinations are essentially unreviewable by the party membership.[4] The Committee's power is such that it alone may declare who is fit to run, and who, by extension, is fit to govern. As the product of state legislative choice, the Committee's power constitutes "state action" within the meaning of the Fourteenth Amendment. *Bullock v. Carter*, 405 U.S. 134, 140, 92 S.Ct. 849, 854, 31 L.Ed.2d 92 (1972).

Because the Committee is an arm of the state, the *private* associational rights of the Republican party do not end the inquiry in this case. *See, e.g., Newton*, 382 U.S. at 299, 86 S.Ct. at 488. Also at stake are Duke's asserted right to associate with a political party free from governmental interference based on ideology,[5] and the Voters' right to vote for a candidate best reflecting their views, free from governmental entanglement. *See Bullock*, 405 U.S. at 143, 92 S.Ct. at 856 ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."). Because the state's action implicates important constitutional rights we must next determine the appropriate level of judicial scrutiny to be applied.

**4.** While the statute appears on one hand to mandate an orderly process through which party primary candidates are to be selected, it also appears to create a process by which intraparty feuds may be resolved without accountability to the party membership. The state cloaks Committee partisans with the power to exclude renegade or unsavory candidates, even though those candidates may enjoy some popularity within the party's ranks. We note that the ultimate responsibility for resolving intraparty feuds rests with the voters, not with the state. *See Riddell v. National Democratic Party*, 508 F.2d 770, 776, 778 (5th Cir.1975). While the state maintains an interest in protecting the two major parties from damaging intraparty feuding or unrestrained factionalism, *see, e.g., Storer v. Brown*, 415 U.S. 724, 735, 94 S.Ct. 1274, 1281, 39 L.Ed.2d 714 (1974), a primary is "not hostile to intraparty feuds; rather it is an ideal forum in which to resolve

### B. Scrutiny Level

The panel in *Duke I* canvassed Supreme Court case law and noted that the Court has often deviated from traditional strict scrutiny analysis in ballot access cases. 954 F.2d at 1529–30 (and the cases cited therein). Most notably, in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court articulated a flexible approach to determine the proper standard of judicial review to be applied in ballot access cases, one that requires a balancing of the Constitutional interests asserted by the plaintiffs and the state's asserted justifications for its legislation:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made."

them." *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 227, 109 S.Ct. 1013, 1022, 103 L.Ed.2d 271 (1989).

**5.** Poitevint, a voting member of the Committee and the Georgia state Republican party chairman, noted in a press statement that

> Duke is a fraud and charlatan whose Nazi ties are an affront to our parents and grandparents who fought to protect our country and this world from domination by Adolf Hitler.... There is no room for disciples of Hitler on the Republican presidential ballot.... Much like Hitler's rise to political power in Germany almost sixty years ago, Duke masks his agenda of hate by appealing to public frustration over the economy and by voicing support for traditional values. But that does not change who he is or what he stands for.

460 U.S. at 789–90, 103 S.Ct. at 1570 (citations omitted); *see Norman v. Reed,* —— U.S. ——, ——, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 213–14, 107 S.Ct. 544, 547–49, 93 L.Ed.2d 514 (1986). The approach adopted in *Anderson* is a balancing test that ranges from strict scrutiny to a rational-basis analysis, depending upon the factual circumstances in each case. *Fulani v. Krivanek,* 973 F.2d 1539, 1543 (11th Cir.1992).

■ In its latest pronouncement in the ballot access area, the Court in *Burdick v. Takushi,* —— U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), reiterated this open-ended approach and explained that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* at ——, 112 S.Ct. at 2063. Thus, while "voting is of the most fundamental significance under our constitutional structure," *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979), the mere fact that a state has created barriers tending to limit the field of candidates does not alone compel strict scrutiny. *Burdick,* —— U.S. at ——, 112 S.Ct. at 2063; *Bullock,* 405 U.S. at 143, 92 S.Ct. at 856. Rather, a court considering a state election law challenge must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick,* —— U.S. at ——, 112 S.Ct. at 2063; *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570.

■ Thus, when the state election scheme burdens a fundamental constitutional right severely, it may survive only if it is narrowly tailored to advance a compelling state interest. *Burdick,* —— U.S. at ——, 112 S.Ct. at 2063. "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* at ——·– ——, 112 S.Ct. at 2063–64 (quoting *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569).

The posture of this case makes it impossible for us to undertake the proper review required by the Supreme Court. While Duke and the Voters have made clear their asserted rights under the First and Fourteenth Amendments, the record before us is devoid of evidence as to the state's interests in promulgating section 21–2–193. This case is before us on appeal from a dismissal of the plaintiffs' amended complaint under Rule 12(b)(6). Discovery has not commenced. The state, therefore, has not as yet asserted its precise interests justifying the burden imposed by its election law.[6]

Because it is possible that upon remand the state's interests may not justify the burden upon the plaintiffs' asserted rights, we vacate the district court's order and remand this case for further proceedings designed to determine with particularity the interests purportedly advanced by section 21–2–193. We take no position as to the ultimate merits of the plaintiffs' claims. The allegations asserted, however, are sufficient to allow the parties to conduct discovery. *Jackam v. Hospital Corp. of Am. Mideast, Ltd.,* 800 F.2d 1577, 1579–80 (11th Cir.1986). Upon a clear determination of those interests, the district court must weigh them against the purported burden upon the plaintiffs' consti-

---

**6.** In its brief to this Court in the first appeal, the state argued that it "has a legitimate basis for establishing an orderly mechanism to identify those persons who will appear on the ballot, but to let that decision fall to the political parties." Brief of Secretary of State Max Cleland at 23. In the same appeal, Poitevint argued that the state "has a legitimate, if not compelling, interest in protecting the associational rights of its political parties." Brief of Alex L. Poitevint at 25. The existence of a state interest, however, is a matter of proof. *Sherbert v. Verner,* 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963). We decline, therefore, to assess the importance of these alleged interests absent a factual determination by the district court below.

tutional rights, then apply the proper level of scrutiny pursuant to the teachings of *Anderson* and *Burdick.*

### III.  CONCLUSION

The Georgia presidential candidate selection committee constitutes state action.  The rights at stake therefore go beyond the private associational rights of the Republican party.  Accordingly, we vacate the district court's order and remand for further proceedings consistent with this opinion.

VACATED and REMANDED.