**David DUKE, et al.**

v.

**Max CLELAND, et al.**

No. 1:92–cv–116–RCF.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 14, 1995.

Oscar N. Persons, Michael P. Kenny, Alston & Bird, and Frank B. Strickland, Wilson, Strickland & Benson, Atlanta, GA for defendant Alec Poitevint.

Michael Bowers, Atty. Gen., and Dennis R. Dunn, Sr. Asst. Atty. Gen., for defendants Max Cleland and Presidential Candidate Sel. Com.

Neil Bradley, Mary Wyckoff, Laughlin McDonald, ACLU Foundation, Gerald R. Weber, ACLU, Atlanta GA, and Samuel G. Dickson, Marietta, GA, for plaintiffs.

### ORDER

RICHARD C. FREEMAN, Senior District Judge.

This action is before the court on plaintiffs' motion for summary judgment [# 47–1]; defendant Max Cleland [Cleland]'s motion for summary judgment [# 45–1]; and defendant/intervenor Alex Poitevint [Poitevint]'s motion for summary judgment [# 44–1].[1] The motions are opposed.

### BACKGROUND

Plaintiff David Duke ran for the Republican nomination for President in 1992. Duke's name, however, was excluded from the Republican primary ballot in Georgia when all three Republican members of the candidate selection committee [the Committee], acting pursuant to Georgia statute, voted to remove Duke's name from the ballot.

The Committee was formed pursuant O.C.G.A. § 21–2–193(a), and consists of the Georgia Secretary of State, a non-voting member who at the time was defendant Cleland, the Speaker of the House of Representatives, the majority leader of the Senate, the minority leaders of both the House and Senate, and the chairpersons of both the Democratic and Republican parties. Under § 21–2–193(a), the Secretary of State submits an initial list of presidential candidates to the Committee. The list is comprised of presidential candidates "who are generally advocated or recognized in the news media throughout the United States as aspirants for that office and who are members of a political party or body which will conduct a

presidential preference primary." *Id.* Acting pursuant to statute, Cleland submitted his list to the Committee, including Duke's name.

Section 21–2–193(a) permits a potential candidate's name to be deleted from the ballot if all committee members of the same political party vote to drop the name. As previously noted, all three Republican committee members so voted. As permitted by § 21–2–193(b), Duke then requested that his name be placed upon the ballot, effectively asking for reconsideration. If any member of the Committee of the same political party of the candidate requests that the name be added to the ballot, then the Secretary of State must place the name on the ballot. *Id.* No Republican member of the Committee so voted, and Duke's name remained off the ballot.

### PROCEDURAL HISTORY

This action has been to the Eleventh Circuit on appeal twice. In *Duke v. Cleland,* 954 F.2d 1526 (11th Cir.1992) [*Duke I* ], the Eleventh Circuit affirmed this court's denial of plaintiffs' request for an injunction and temporary restraining order, which request would, if granted, have prevented the printing of ballots for Georgia's presidential preference primary unless plaintiff David Duke were listed as a Republican candidate. The only issue on that appeal, however, concerned whether the Committee unconstitutionally excluded Duke from the ballot on the basis of his political beliefs. *See id.,* 954 F.2d at 1530 n. 5 (defining the scope of plaintiffs' challenge). The Eleventh Circuit ruled that plaintiffs had shown no likelihood of success on the merits because the Republican Party's right to define its membership trumped whatever right Duke had to associate with the party, and the party's associational interests clearly outweighed the other plaintiffs' right to vote for Duke in the Republican primary. *Id., passim.*

Subsequent to that determination, plaintiffs amended their complaint to make a facial challenge to the Georgia statute regulat-

---

**1.** The outstanding discovery dispute referenced in the court's Order of August 19, 1994, has been resolved by counsel. Accordingly, the motions relating to this dispute are denied as moot.

ing ballot access, alleging that the statue violates their rights under the First and Fourteenth Amendments. This court granted defendants' motions to dismiss on the grounds that there was no state action in the denial of ballot access to Duke, and that the statute did not violate plaintiffs' rights. On appeal, *Duke v. Cleland,* 5 F.3d 1399 (11th Cir.1993) (*Duke II*), the Eleventh Circuit held that the Committee's action did constitute state action, and that remand was appropriate to determine "with particularity the interests purportedly advanced by [O.C.G.A. §] 21–2–193 ... [and to] weigh them against the purported burden upon the plaintiffs' constitutional rights, then apply the proper level of scrutiny pursuant to the teachings of *Anderson [v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) ] and *Burdick [v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ]." *Duke II,* 5 F.3d at 1405–06. Following the Eleventh Circuit's mandate, the court proceeds to do just that.

*DISCUSSION*

### A. Summary Judgment Standard

Under Fed.R.Civ.P. 56, the court should grant a motion for summary judgment where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The movant carries his burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). As the Eleventh Circuit has explained, "[o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 334, 106 S.Ct. at 2553. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judg-

ment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The court, resolving all reasonable doubts in favor of the nonmovant, must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

### B. The Interests of the State

■ It is settled law that states may regulate the "time, place, and manner" of elections, and thus have a corresponding interest therein. *E.g., Burdick,* 504 U.S. at 433–34, 112 S.Ct. at 2063. Indeed, as the *Burdick* Court noted, common sense dictates that the states *must* have involvement in the election process. *Id.* One of these common-sense modes of involvement is the determination of how many names appear on a ballot. This determination by the state necessarily implies a determination as to *who* appears on the ballot. *See Anderson,* 477 U.S. at 786–90 and n. 9, 103 S.Ct. at 1569–70 and n. 9 (citing cases upholding restrictions on ballot access). Thus, interests of the state are implicated in the ballot access arena.

■ Defendants do not argue, however, that the state's interests in regulating ballot access as applied to the facts of this case involve only issues of expediency or efficiency. Rather, defendants assert that the state also maintains an interest in protecting the rights of political parties to define their membership, and that § 21–2–193(a) and (b) is the mechanism by which that interest is vindicated. As a threshold matter, there is no doubt that the Republican Party possesses a clear and well-fortified First Amendment right to define its membership. *See Duke I, passim.* The essence of the holding in *Duke I* is that, although the Republican members of the Committee excluded Duke on the basis of his political beliefs, the right of the party to associate and "protect itself from those with adverse political principles" was a compelling interest superior to plaintiff's asserted right. *Id.,* 954 F.2d at 1532–33.

■ It should be equally clear that the state has an interest in protecting, enforcing, and vindicating the rights of its citizens, in-

cluding political parties. More important, even if the state possesses no "positive" interest in actively enforcing private rights, the state has an undeniable obligation to *avoid* infringing those rights. Because the state has a basic obligation to regulate elections, and because that regulation will "invariably impose some burden" upon voters and parties, *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063, the state has both an interest and a constitutional duty to tread lightly around such freedoms as the right of parties to define their membership when regulating such matters as ballot access. Whether the State of Georgia did in fact tread lightly in all respects is a separate inquiry; the point at this juncture is the fact that the State of Georgia has an interest (perhaps even a duty in the context of ballot access) in maintaining and facilitating the Republican Party's ability to control its identity.

 Recognizing that the determination of the existence of a state's interest is a matter of proof, *see Sherbert v. Verner,* 374 U.S. 398, 405–07, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963), the Eleventh Circuit remanded to this court for a clear determination of the interests of the state, a determination that this court must assume is at least in part a factual determination. Even though the court finds the law settled and the interest clear, in this regard, the court finds the statute itself indicative and probative of the interest. As the parties agree, because the State of Georgia maintains no formal legislative history for its statutes, the best evidence of the intent of the General Assembly is the language of the statute. *See Burgess v. Meinken,* 204 Ga.App. 600, 420 S.E.2d 329, 330–31 (1992). Georgia's statutory scheme expressly contemplates the inclusion of the major political parties in the ballot access determination. *See* § 21–2–193(a). By designating the Committee members on the basis of the offices (legislative and partisan) they hold, the General Assembly clearly chose to include the nominal leaders of the Democratic and Republican parties. The structure of the Committee contemplates equal power by the two parties through equal representation on the Committee and the establishment of a non-voting chairperson. *Id.* To the extent that all names submitted by the non-voting chairperson appear on the respective party ballots unless the appropriate party members unanimously agree to delete the name, the determination of which names are to appear on the ballot is not made by the Committee as a whole, nor by the state,[2] but by the three party representatives. *Id.*

 The inclusion of the parties in the decisionmaking process *ipso facto* demonstrates an intent of the General Assembly to delegate much of the power of ballot access determination away from the state and to the parties. This scheme is consonant with the interest of the state in not interfering with (and possibly even facilitating) the rights of the parties to define their membership and their representatives.[3] In view of the forego-

2. The finding of the presence of state action in *Duke II* does not alter this analysis. Although the *Duke II* panel held that the decision of the three party members of the Committee is "fairly attributable to the state" because the power to exclude comes "directly from the state *ab initio,*" *Duke II,* 5. F.3d at 1403–04, the *Duke II* panel did not in any respect find that the three party members were not also party representatives. In other words, the *Duke II* court held no more than that, at the time of the decision, the three party members wore state-action hats. In *Duke I,* however, while assuming *arguendo* that the Committee vote constituted state action, the court clearly held that the three party members also acted in a representative capacity for the party, and therefore also wore a party hat at the time of the decision. Indeed, the foundation for the analysis in the *Duke I* opinion is the fact that the Committee's decision was based upon party considerations.

The *Duke II* court did not discuss this substantive holding of *Duke I,* and instead, in view of this court's determination that there was no state action, focused on the question of whether the Committee's action was in fact state action, answering that question in the affirmative. The *Duke II* court therefore ratified the assumption in the *Duke I* opinion—there was state action. Thus, the finding in *Duke II* simply allowed plaintiffs through the courthouse doors. Even though the *power* to exclude came from the state, the *decision* to exclude is made by party representatives.

3. Plaintiffs point out that another code section indicates that the intent of the General Assembly in establishing the presidential preference primary is to enable "electors [to] express their preference for one person to be the candidate for nomination by his [sic] party or body for the office of President of the United States."

ing, the court finds this interest to be legitimate and compelling.

### B. The Burden on Plaintiffs' Rights

 In assessing whether and to what degree the statute itself and the decision of the Committee made pursuant to that statute burdens plaintiffs' constitutional rights, the court must first separate the rights of Duke from the rights of the other plaintiffs, supporters of Duke who wished to vote for him in the 1992 primary. As to the latter concern, plaintiffs cite *Lubin v. Panish,* 415 U.S. 709, 716–17, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974), for the proposition that the right to vote is "heavily burdened" if the choices are narrowed to one or two candidates when other people are "clamoring for space on the ballot." This, of course, is correct. Plaintiffs *do not* mention, however, that, in the very next breath, the Supreme Court stated that "[t]his does not mean that every voter can be assured that a candidate to his liking will be on the ballot." *Id.* Again, common sense is in order. Plaintiffs have a right to vote for the candidate of their choice, but only the candidate of their choice on the ballot. They cannot demand that, of the universe of candidates, the exclusion of their *favorite* candidate from the ballot necessarily "heavily burdens" their rights. To so hold would open the ballot to anyone who has some support in the electorate, something *Lubin* noted is not constitutionally required or even desirable. *Id.,* 415 U.S. at 714–15, 94 S.Ct. at 1319.

 Further, plaintiffs have cited, and the court has found, no authority for the proposition that the plaintiffs have a right to vote for their favorite candidate as a "Republican" in a non-binding primary. Indeed, the law of this case indicates precisely the opposite. *See Duke I,* 954 F.2d at 1531. In *Duke I,* the Eleventh Circuit found that any burden on the plaintiffs other than Duke is "considerably attenuated," and possibly nonexistent. *Id.* and n. 6.

As to the burden on Duke, the *Duke I* court similarly found that his right of association is not infringed by the decision of the three party members to exclude him from the ballot. It follows that his right was not heavily burdened by their actions.

Plaintiffs' amended complaint, however, adds the additional claim that the statute, not simply the decisions made pursuant to the statute, burdens their constitutional rights. In this respect, plaintiffs' argument rests on the "unfettered discretion" afforded the three party members on the Committee to define who is and who is not fit to run as a Republican. This argument mirrors the Eleventh Circuit's language in *Duke v. Smith,* 13 F.3d 388 (11th Cir.1994) [Florida *Duke*], where the court struck down a Florida statute that provided no guidelines or standards for reconsidering placement on the ballot of candidates' names who had been previously excluded.

Though the court will apply a strict scrutiny analysis below in order to err on the side of caution, the court believes that the differences of the statute in this case, as well as the interests of the state advanced herein, distinguish Florida *Duke* and its result. First, though the candidate selection committee's composition under the Florida law mirrors the composition under § 21–2–193(a), the Florida statutory section allowing reconsideration differs in significant respects from § 21–2–193(b). Whereas § 21–2–193(b) allows a candidate's name to be placed on the ballot if only one member of the candidate's party agrees to do so, the Florida statute does nothing of the kind. Rather, that statute simply states that the committee will reconvene at a certain date and time, and reconsider. Fla.Stat. § 103.101(2)(c) (1991). There is no failsafe mechanism and no mention of the role of the political party in the decision to reconsider. While the Eleventh Circuit found that the Florida statute "heavily burdened" those plaintiffs' rights by sub-

---

O.C.G.A. § 21–2–191. The state, of course, has an interest in facilitating the right of persons to vote. This right, however, is stated in the context of a *party* vote. If the Republican Party determines that a person is not a *bona fide* party member or holds views adverse to party princi-

ples, then the interest of facilitating party voting is not affected by the exclusion from the ballot of a non-party member. In short, plaintiffs are correct in citing this code section, but it does not affect the analysis of the code section challenged.

jecting them to the "unfettered discretion" [4] of the committee, Florida *Duke*, 13 F.3d 395, this court believes the differences in the statutes at issue there and here compel a contrary conclusion.[5]

### C. Applicable Level of Scrutiny

■ Though the court does not believe plaintiffs' rights were "heavily burdened," the court recognizes that the differences in the Florida statute and the Georgia statute are not so salient that a contrary interpretation might not obtain. Therefore, for the sake of caution, the court will apply the strict scrutiny test to determine whether the statute was "narrowly tailored to advance a compelling state interest." *Burdick*, 504 U.S. at 433, 112 S.Ct. at 2063; *see also id.* (strict scrutiny applies where rights are heavily burdened).

### D. Scrutiny Level Applied

■ Plaintiffs argue that the state's statutory scheme, rather than protecting the rights of political parties, actually interferes with the rights of the parties to conduct their own affairs, and, therefore, is not narrowly tailored to advance the state's interest. Plaintiffs' argument is two-fold: First, the Eleventh Circuit in *Duke II* noted that the decisions by the three party members on the Committee are "essentially unreviewable" by the party membership, a circumstance apparently created by the statutory scheme. *Duke II,* 5 F.3d at 1404 and n. 4. According to plaintiffs, "[b]y investing unfettered discretion in three chosen party members, the General Assembly may have hoped the three would act in a representative capacity, but the unfettered discretion is the constitutional infirmity, not the constitutional justification." Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment, 6. Second, plaintiffs repeatedly assert that it was the

state, through the Committee, that made the determination, and not the party. Plaintiffs cite *Duke II* for the correct proposition that the state has no interest in resolving intraparty feuds. *Duke II,* 5 F.3d at 1404 n. 4.

The common thread running through plaintiffs' arguments is the notion that the three party members of the Committee do not and did not represent the party. In the first contention, plaintiffs essentially argue that the statute cannot survive scrutiny because the state delegates the power to three people to act in an arbitrary manner, *i.e.,* contrary to the wishes of the party as a whole. In the second contention, plaintiffs argue that the three party members were acting on behalf of the state, not the party.

■ The court finds the statute narrowly tailored to advance the stated interest because, as noted *supra* n. 2, the General Assembly clearly contemplated that these three Republican members would act in a representative capacity, and carefully drew the statute to achieve that result. Plaintiffs make much of the fact that there are no standards on file with the state or within the record by which one can determine who is and who is not a Republican. As a consequence, plaintiffs argue, any decision by the Committee members must be necessarily based upon their subjective opinions. While that may be true, it does not alter the fact that if these party leaders, and that is exactly what they are, are not in the best position to opine on the characteristics of a Georgia Republican, no one is. Duke may call himself a Republican, and some may agree. Others may not. These three Committee members obviously did not, and they are clearly in a position to make such judgments on behalf of the party. More important, the statute simply could not be drawn to ensure that those who agree with Duke would be placed on the Committee.

---

**4.** It must be stressed that the unfettered discretion of the Committee is a separate concept from the unfettered ability of the Committee members to take actions unreviewable by the party rank and file. Though plaintiffs interchange the two, the court will not.

**5.** Further, the interests identified in the Florida *Duke* case differ from the interests advanced in the instant case in that the only interest found by

the district court in that case was the interest of the State of Florida in providing a time and place for meeting to determine whether the name deleted should be reconsidered. Florida *Duke,* 13 F.3d at 394–95. In contrast, the court here finds the State of Georgia's interest in protecting political parties' ability to define and select their candidates to be legitimate and compelling.

Plaintiffs' suggested re-write of the statute, that the party itself elect persons to carry out the "party representatives" function on the Committee, would not improve upon the statute. First, plaintiffs assume that the three party representatives would differ from those identified by the statute— an assumption possible in the abstract, but still no more than an assumption based upon speculation. Second, even if the Committee was differently constituted, these persons would still act with the same state power and "unfettered discretion" plaintiffs identify as the "constitutional infirmity" in the statute. Plaintiffs' ultimate complaint, therefore, is with representative decisionmaking in general, not as applied in this case. Whether the judgments made by this or any other Committee are correct, *i.e.*, whether they represent the views of most Georgia Republicans, is something that Duke cannot prove or disprove absent submission to the full party, which has not happened and is not suggested.

In short, plaintiffs cannot demand a system that necessarily produces a result; they can only demand a system sensitive to their constitutional rights. If the statute permissibly allows representative decisionmaking,[6] the statute must ensure that the deck is not stacked and the decisions eschew arbitrariness. The statute, as written, is designed to precisely address these issues. First, the party representatives are not chosen at random, or by subjective determination by an interested person, but by neutral criteria clearly intended to select the nominal party leaders. If such a choice stacks the deck, then the party is the one that stacked the deck by choosing such leaders. Second, the element of arbitrariness is greatly mitigated by the feature of the Georgia statute that distinguishes it from Florida's: though a

unanimous vote of the three Committee members is required for deletion, only one member needs to vote to restore or add a name. In this way, even if the decision of all three Committee members is "unfettered," it is not without a protective mechanism.

In conclusion, the court finds that the state has a general interest in conducting orderly and efficient elections, and a specific and compelling interest in allowing the parties to choose their candidates. The statute is narrowly tailored to advance those interests in that it identifies three logically representative members of each party to serve on the Committee, and provides a check against arbitrariness by allowing only one member of the party on the Committee to override the unanimous decision of the Committee. Defendants' motions for summary judgment are granted; plaintiffs' motion for summary judgment is denied.

*CONCLUSION*

Accordingly, plaintiffs' motion for summary judgment [# 47–1] is DENIED. Defendant Max Cleland's motion for summary judgment is GRANTED. Defendant/intervenor Alex Poitevint's motion for summary judgment [# 44–1] is GRANTED. The Clerk is DIRECTED to ENTER JUDGMENT in favor of each defendant on plaintiffs' amended complaint, to TERMINATE all outstanding motions, and to CLOSE this case.

SO ORDERED.

---

6. Taken to its logical extreme, plaintiffs' argument against the statute is an argument against the creation of the Committee itself. There are two alternatives to the creation of the Committee. First, the Secretary of State could be granted total sway over the names appearing on the ballot. While plaintiffs would not quarrel with the alternative under the facts of this case, it is not difficult to imagine scenarios where other plaintiffs, including the political parties themselves, would find severe constitutional flaws in such a system. Second, the parties could hold a convention (or the like) of the full party to determine the names on the ballot for the primary. Such a system, of course, would likely duplicate the results of the primary itself, and, in theory, reproduce the results the Committee members achieved working in their representative capacity. Thus, the Committee serves an important function in allowing the general interest of the state in conducting orderly and efficient elections to be vindicated through a process that also advances the parties' interests in autonomy.