*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0391p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RALPH NADER,

        *Plaintiff-Appellant,*

    *v.*

J. KENNETH BLACKWELL,

        *Defendant-Appellee.*

No. 07-4350

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 06-00821—Edmund A. Sargus, Jr., District Judge.

Argued: July 22, 2008

Decided and Filed: October 29, 2008

Before: BOGGS, Chief Judge; and MOORE and CLAY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mark R. Brown, CAPITAL UNIVERSITY LAW SCHOOL, Columbus, Ohio, for Appellant. Pearl M. Chin, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Mark R. Brown, CAPITAL UNIVERSITY LAW SCHOOL, Columbus, Ohio, for Appellant. Richard N. Coglianese, Daniel C. Roth, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

BOGGS, C. J., delivered the lead opinion. MOORE, J. (p. 16), and CLAY, J. (p. 17), delivered the opinion of the Court inasmuch as MOORE, J., joined the opinion of Judge CLAY, and CLAY, J., joined the opinion of Judge MOORE.

---

## OPINION

---

BOGGS, Chief Judge. As my colleagues' opinions for the court appear to me to be a bit succinct, I write to provide some additional facts and reasoning in support of the same result.

Ralph Nader ran for President of the United States in 2004. Under Ohio law, he needed to collect 5000 signatures on his nominating petition to be placed on the Ohio general-election ballot. Circulators of Nader nominating petitions collected over 14,000 signatures, but local election boards invalidated approximately 8000 of them, leaving 6464 signatures. J. Kenneth Blackwell, then Ohio's Secretary of State, certified Nader for placement on the ballot. However, a group of Ohio Democratic voters challenged Nader's signatures, and Blackwell directed an attorney in his office

to hold a hearing regarding the validity of the remaining 6464 signatures. After considering testimony and other evidence, the staff attorney invalidated 2700 more signatures. After these invalidations, Nader had fewer than 5000 valid signatures, and Blackwell removed him from the ballot on September 28, 2004. In October 2004, a federal district court denied Nader's request for injunctive relief, the state courts denied his request for mandamus relief, and this court denied his emergency appeal. In November 2005, we dismissed his regular appeal as moot.

In this § 1983 case, filed in September 2006, Nader sued Blackwell in his personal capacity for allegedly violating Nader's First Amendment rights. According to Nader, Blackwell violated his rights when he applied Ohio Revised Code § 3503.06, which requires that petition circulators reside and be registered to vote in Ohio, to Nader's nominating petitions. The district court dismissed Nader's suit, holding that Nader lacked standing and, alternatively, that Blackwell enjoyed both qualified and absolute immunity. We hold that Nader has standing to bring this suit, but we affirm the district court's holding that Blackwell enjoys qualified immunity.

## I

## A

On August 18, 2004, Nader and his vice-presidential running mate, Peter Camejo, filed a Joint Statement of Candidacy and Nominating Petition with the Ohio Secretary of State's Election Division. *See* Ohio Rev. Code Ann. § 3513.263 (West 2004). Under Ohio law, 5000 signatures are required for an independent candidate to be placed on the ballot. Ohio Rev. Code Ann. § 3513.257(A) (West 2004). The Nader-Camejo nominating petition appeared to have 14,473 signatures.

The Secretary of State's Election Division processed the nominating petition and directed the individual Ohio county boards of elections to determine the validity of a petition, part-petitions (the individual petition sheets that are circulated for signatures), and signatures. On September 8, 2004, after reviewing the findings of the county boards, the Elections Division determined that only 6464 signatures on the petition were valid. That day, then-Secretary of State Blackwell certified Nader's candidacy for President, meaning that Nader's name would appear on the Ohio ballot. On August 30, 2004, thirteen Ohio electors ("the protestors") filed a protest with the Secretary of State challenging the validity of many of the remaining 6464 signatures. *See* Ohio Rev. Code Ann. § 3513.263 (West 2004) ("Written protests against such nominating petitions may be filed by any qualified elector eligible to vote for the candidate whose nominating petition he objects to . . . .").

In response to the protest, a hearing was held at the Office of the Secretary of State on September 21-24, 2004. *See ibid*. ("Upon the filing of such protests, the election officials with whom it is filed shall promptly fix the time and place for hearing it . . . ."); *ibid*. ("At the time and place fixed, such election officials shall hear the protest and determine the validty [sic] or invalidity of the petition."). Blackwell designated Gretchen A. Quinn, a staff attorney in his office, as the hearing officer, and she conducted the hearing. Both the protestors and Nader and Camejo were represented by counsel at the hearing. Both were given the opportunity to offer evidence (including affidavits and documents) and make statements. Testimony was limited to information about the 6464 signatures validated by the boards of elections. The protestors challenged signatures gathered by fourteen petition circulators, based on various alleged violations of Ohio law that would invalidate the signatures that they had collected.

On September 28, Quinn issued and sent to Blackwell a thirty-one page memo of "Findings of Fact and Conclusions of Law." Quinn concluded that there were "a number of significant problems relating to the petition, particularly in regard to the people who purportedly had circulated

many of the part-petitions that were subject to the protest." We now detail Quinn's findings, moving in order from the uncontroversial findings to those findings that are the basis of this lawsuit.

First, Nader has never challenged Quinn's invalidation of 17 signatures because they were not dated. Neither has he challenged Quinn's finding that the election board of Hamilton County made an arithmetic error, the correction of which reduced the number of signatures by 13. Accordingly, excluding these 30 signatures reduced Nader's 6464 signatures to 6434.

Second, Quinn made several findings that prompted the parties to stipulate to the invalidation of many signatures. Those findings were:

Jill Lane allegedly circulated 43 part-petitions with 295 signatures. Lane testified that she had signed some of the circulator statements on some of the 43 part-petitions, that her signature on others had been forged, and that she could not tell if her signature was forged on yet others of the 43 part-petitions. She also testified that never personally circulated any Nader part-petitions and that she never witnessed the affixing of any signatures to the part-petitions. In fact, Lane testified that her cousin, who was not an Ohio resident, had told her he was circulating petitions against same-sex marriage and asked her to sign the circulator statements. Ohio Revised Code § 3501.38(E) states that petition circulators must personally witness the affixing of every signature, otherwise an entire part-petition is invalid. The parties stipulated that the 295 signatures on part-petitions bearing Lane's name as circulator would be invalid.

Michael Cottrell testified that he never actually circulated five part-petitions bearing 32 signatures. The parties stipulated that those 32 signatures were invalid.

Melody Hudson, Jill Lane's daughter, testified that she never circulated 12 part-petitions bearing her name and containing 33 signatures. The parties stipulated that those 33 signatures were invalid.

Richard Hudson, Jill Lane's son, testified that he signed the statements on six part-petitions containing 45 signatures, but that he had not acted as a circulator and had not witnessed any signatures. The parties stipulated that those 45 signatures were invalid.

One part-petition bearing one signature was allegedly circulated by a Michael Dowham, but a Michael Bonham testified that he, not any Michael Dowham, lived at the address given for Dowham. The hearing officer concluded that there was no such person as Michael Dowham, and the parties stipulated the signature was invalid.

In total, the parties stipulated that 406 signatures were invalid. Excluding those signatures from the tally of 6434 signatures, Nader still had 6028 signatures.

Third, Quinn invalidated other signatures based on findings that are not being challenged here. Those findings were:

Greg Reese testified that he personally circulated and witnessed only eight of the 22 part-petitions bearing his name. Reese was unable to distinguish which part-petitions he had or had not actually circulated. Accordingly, Quinn invalidated the 81 signatures on the part-petitions from Reese that the local election boards had found valid.

Antoine Jackson allegedly circulated 36 part-petitions containing 268 signatures. Jackson testified that he did not personally circulate, and thus did not witness the signatures on, 25 to 30 of the petitions bearing his name. Jackson could not distinguish between the part-

petitions he circulated and those he did not.  Accordingly, Quinn invalidated the 268 signatures.

Ronald Waller allegedly circulated 58 part-petitions containing 366 signatures.  He attested under penalty of election falsification that he resided in Cincinnati.  Waller's mother swore in an affidavit that he had not lived at the given address since March 2004.  One individual whose name was on the petition swore that he signed a petition circulated by a white man and a white woman.  Waller is a black man.  Quinn found that the evidence did not show that Waller was not an Ohio resident, merely that he was not resident at the address listed on the part-petitions.  Quinn found that the evidence supported a finding of election falsification on two part-petitions because they were circulated by persons other than Waller, *see* Ohio Rev. Code Ann. § 3501.38 (West 2004), and invalidated 15 signatures from those two part-petitions.

Robert Ellis allegedly circulated 12 part-petitions containing 66 signatures.  Ellis stated on the part-petitions, under penalty of election falsification, that he resided at an address in Cincinnati, Ohio.  However, the process server for the hearing could not locate Ellis at the address listed on the petitions, and the resident of that address provided an affidavit stating that Ellis did not live there in summer 2004.  The management company for the apartment Ellis listed also swore that Ellis did not reside there and only other people had lived there since 2003.  On a separate petition regarding same-sex marriage, Ellis had listed his circulator address as being in Illinois.  Ellis provided a voter registration card with an Ohio address, but that address proved to be a hotel, and the desk clerk indicated that Ellis was no longer a guest.  Citing Ohio Revised Code § 3503.06, Quinn stated that only a qualified elector of Ohio may circulate a nominating petition, and that qualified electors must reside in Ohio.  Quinn found that Ellis did not reside at any of the addresses he provided, and therefore was improperly registered to vote at those addresses.  Accordingly, the 66 signatures on the part-petitions he circulated were invalid "on the separate grounds that he swore to a false residence address, and he is not a qualified elector of Ohio."

Curtis Warner allegedly circulated 22 part-petitions containing 189 signatures.  On his part-petitions, Warner stated under penalty of election falsification that he resided at an address in Cincinnati.  Warner signed a voter registration card using the same address on August 5, 2004.  Sworn statements from the current resident and property manager of the address indicated that Warner had not lived there at least since 2003.  Same-sex-marriage petitions that Warner circulated at the same time showed that he had a California address.  Quinn found that Warner's part-petitions were invalid because he "swore to a false address" and "is not a qualified elector of Ohio" and invalidated all 189 signatures, albeit without citing § 3503.06.

Thus, Quinn invalidated an additional 619 signatures because certain circulators (i.e., Jackson and Reese) could not tell which petitions they had actually circulated, because one circulator (i.e., Waller) had not actually circulated certain part-petitions, and because she explicitly found that certain circulators (i.e., Ellis and Warner) had sworn to a false address.  Nader does not challenge Ohio's requirements that circulators witness all signatures and list their true residence.  *See* Ohio Rev. Code Ann. §§ 3501.38(E), 3513.261.  Excluding these 619 signatures, Nader still had 5409 signatures, enough to qualify for the ballot.

Fourth, Quinn's last set of findings relate to the focus of this lawsuit.  Her remaining findings were as follows:

Daryl Oberg allegedly circulated 45 part-petitions containing 341 signatures.  As with Ellis and Warner, the "manifest weight of the evidence" indicated that Oberg did not reside at the

address he provided on his part-petitions at the time he circulated the petitions. He stated under penalty of election falsification that he resided at an address in North Royalton, Ohio. The landlord at that address stated that Oberg had moved out in July 2000. Oberg had registered to vote in California in September 2003. Other addresses for Oberg on different part-petitions were also false. Nader's counsel produced affidavits from Oberg stating that he was an Ohio resident, but Quinn accorded no weight to "these self-serving affidavits, which were faxed from a Nevada motel" and which did not state where in Ohio Oberg purported to "permanently reside." Accordingly, Quinn found that Oberg had moved out of Ohio and lost his Ohio residence when he moved to California. Accordingly, Quinn invalidated 341 signatures collected by Oberg. However, unlike her findings regarding Ellis and Warner, Quinn did not explicitly state that she found that Oberg had listed a false address. Rather, she justified her decision to invalidate the signatures only on the ground that Oberg was not an Ohio resident or voter, and we will assume that is the reason she invalidated the signatures he collected.

George Woods allegedly circulated seven part-petitions bearing 44 signatures. He stated under penalty of election falsification that he resided at an address in Dayton. The actual resident of that address, Woods's nephew, swore that Woods had visited him in July 2004 but actually resided in Texas. Records indicated that Woods had registered to vote using the Ohio address in 2000, but had registered to vote in Texas as of February 2004. Explicitly finding that Woods could not meet the requirements under § 3503.06 because he was not an Ohio resident, Quinn invalidated his 44 signatures.

John M. Laws allegedly circulated 54 part-petitions containing 544 signatures. Laws stated under penalty of election falsification that he resided in Lorain, Ohio. The process server found the address vacant and was told by a neighbor that Laws no longer lived there. Laws's wife swore that Laws had moved out of the house in fall of 2003. A foreclosure report indicated that the house was vacant between January and June 2004. In August 2003, Laws registered to vote in Los Angeles, California, and his registration form listed his prior address as another address in California, not Lorain, Ohio. On July 5, 2004, Laws circulated Nader petitions in Nevada. On those petitions, under penalty of perjury, Laws swore that he resided in Las Vegas, Nevada. Quinn found that Laws was not a resident of Ohio, and hence could not be an Ohio elector. Accordingly, she invalidated the 544 signatures he had gathered. In addition, Quinn noted that numerous affidavits from purported signers of Laws's part-petitions indicated that the individuals had never signed the petition or were told they were signing a petition for the gay marriage amendment.

Steven Larry Laws allegedly circulated 100 part-petitions containing 772 signatures. He stated on the part-petitions that he resided in Lorain, Ohio. The process server found that Laws's sister lived there and left process with her. The sister commented that Steven Laws "was in Nevada." Laws registered to vote in Las Vegas in January 2000, and he stated under penalty of perjury that his Nevada address he provided was his sole legal place of residence. The Nevada form listed his prior address as being in Los Angeles. In 2002, he registered to vote in Carson, California. One month later, he registered to vote in Los Alamitos, California. In 2003, he registered in Hollywood, California, and he voted in a California statewide special election for governor. Ohio law provides that a person who goes to another state and votes there loses his residence in Ohio. Ohio Rev. Code Ann. § 3503.02(H) (West 2004). Since he had ceased to be an Ohio elector by operation of law, Laws could not be an elector of Ohio unless he reestablished Ohio residence, which Quinn found he had not. In addition, Laws was convicted of criminal non-support in California, found guilty, and stated at his sentencing hearing that he was a California resident. The same lawyer who represented Laws at that sentencing submitted affidavits to Quinn stating that Laws was an Ohio resident. Quinn gave no weight to the affidavits. Quinn invalidated the 772 signatures.

Thus, Quinn invalidated an additional 1701 signatures because the circulators were not Ohio residents and electors as required by § 3503.06.[1] Quinn's findings that none of these men was an Ohio resident necessarily means that the men were not correct when they claimed to reside at Ohio addresses. However, since Quinn did not explicitly base her decision on the grounds of election falsification, our analysis below will proceed on the basis that she invalidated their signatures for failure to comply with Ohio's residence and registration requirements, as codified in § 3503.06.[2] Excluding these signatures gathered by Oberg, Woods, John Laws, and Steven Laws, Nader had only 3708 valid signatures, well below the 5000-signature threshold. Notably, the invalidation of Oberg's and Woods's signatures, taken together, still left Nader with 5024 signatures, and thus Quinn's findings about their signatures were legally insufficient to invalidate Nader's candidacy. By contrast, Quinn's findings regarding either John or Steven Laws would be sufficient to invalidate Nader's candidacy: invalidation of either John Laws's 544 signatures or Steven Laws's 772 signatures would have reduced Nader's total valid signature count below the 5000 signatures required.

On September 28, 2004, Blackwell formally accepted Quinn's report, stated that Nader had only 3708 valid signatures, and ordered the boards of elections to remove the Nader-Camejo joint candidacy from the ballot or otherwise notify voters that a vote cast for Nader-Camejo would not be counted. Under Ohio law, election officials' determinations are "final." Ohio Rev. Code Ann. § 3513.263 (West 2004).

**B**

On October 4, 2004, five Ohio residents who served as members of a committee to qualify Nader and Camejo for the Ohio ballot ("the relators") filed an action in the Supreme Court of Ohio seeking:

> a writ of mandamus to compel the Secretary of State to order Ohio's 88 county boards of elections to (1) update their voter registration records, (2) re-review the part-petitions based on updated records, (3) validate previously invalidated signatures on part-petitions that were improperly invalidated because of outdated records, and (4) review unreviewed signatures on totally invalidated part-petitions where updated records show that the circulators are duly registered voters. In addition, relators seek a writ of mandamus to compel the Secretary of State to count as valid those signatures on part-petitions that were invalidated because of the circulator-residency requirement of R.C. 3503.06. Finally, relators request a writ of mandamus to compel the Secretary of State to certify as valid Nader's candidacy . . . upon a finding, following the boards' review of updated records, that at least 1,292 signatures previously invalidated are in fact valid.

---

[1] We note that Quinn did not accept all of the protestors' challenges. She rejected a challenge to thirty-three signatures on the grounds that the signatures used first initials instead of full names and rejected a challenge based on the claim that some circulators claimed to have witnessed more signatures than were on their part-petitions. We also note that Quinn rejected the allegation that the Nader campaign was responsible for the misconduct she had found. Quinn concluded merely that "the Nader campaign was careless with respect to its association" with the paid consultant leading its signature gathering effort in Ohio, and she found "no evidence that Nader campaign directed or condoned the collection of signatures in any manner that violated Ohio law." Quinn declined to invalidate the entire Nader petition on the grounds of "pervasive fraud."

[2] At the time, section 3503.06 stated: "No person shall be entitled to vote at any election, or to sign or circulate any declaration of candidacy or any nominating, initiative, referendum, or recall petition, unless the person is registered as an elector and will have resided in the county and precinct where the person is registered for at least thirty days at the time of the next election." Ohio Rev. Code Ann. § 3503.06 (West 2004).

*Blankenship v. Blackwell*, 817 N.E.2d 382, 385 (2004) (per curiam). This suit challenged only the actions of the local elections boards in invalidating 8009 of Nader's signatures. *Ibid.* The relators also claimed that the residency requirement in Ohio Revised Code § 3503.06 and 3501.38 for circulators of nominating petitions violated the petition signers' free speech rights under the First Amendment. "More specifically, relators' complaint challenges the R.C. 3503.06 requirement that petition circulators be residents of the state of Ohio." *Ibid.* On October 22, the Ohio Supreme Court denied the requested relief on the ground of laches, because the relators had waited until four months after they had begun circulating petitions to challenge the circulator-residency requirement and thirty-one days after the local election boards had invalidated the 8009 signatures before raising their claims about stale voter registration information. *Id.* at 386-87. The Ohio Supreme Court also found that the delay had prejudiced the Secretary of State and would "endanger Ohio's election preparations." *Id.* at 388. Finally, the Ohio Supreme Court held that the action must be dismissed because "relators failed to bring this action in the name of the state on their relation." *Id.* at 388-89. Since the objection was raised and the relators failed to seek leave to amend the case caption, relief was denied for failure to comply with the rule. *Ibid.*

On October 6, 2004, while the state mandamus action was pending, the relators filed suit in federal district court seeking a temporary restraining order barring Blackwell from removing Nader's name from the Ohio ballot, an injunction compelling Blackwell to count as valid the nominating signatures of qualified electors previously invalidated due to the circulators' failure to meet the residency requirement, and a declaratory judgment that Ohio's residency requirement for circulators violated the First and Fourteenth Amendments. *See Blankenship v. Blackwell*, 341 F. Supp. 2d 911, 916-17 (S.D. Ohio 2004).

On October 12, 2004, the district court denied the motion and dismissed the case. After declining to abstain from hearing the case, the district court focused on the Supreme Court's decision in *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999). The district court noted that the *Buckley* Court held that a requirement that circulators of initiative petitions be registered in-state violated the First Amendment, but had declined to address whether a law requiring circulators to reside in-state was constitutional. *See Blankenship*, 341 F. Supp. 2d at 920-21 (discussing *Buckley*, 525 U.S. at 197). The district court concluded, "In view of the *Buckley . . .* decision, it appears clear that the requirement of Ohio law that circulators be registered voters is unconstitutional." *Id.* at 921-22. However, the court stated that lack of registration was not "the primary basis" upon which Blackwell invalidated the signatures since Blackwell and Quinn had emphasized the failure to meet the residency requirement. *See id.* at 922 n.12 (noting also that under Ohio severability law, the patent unconstitutionality of the registration requirement did not automatically invalidate the residency requirement, quoting Ohio Rev. Code Ann. § 1.50). The district court held that, although *Buckley* had not addressed the constitutionality of state residency requirements, the district court had "every reason to assume that the decision applies to this case." *Id.* at 922. The district court applied strict scrutiny review, concluded that the state had a compelling interest in preventing election fraud, and concluded that the Quinn report provided ample evidence of actual fraud in this case. *See id.* at 922-23.

In light of this actual fraud, the court declined to decide the constitutionality of § 3503.06's residency requirement. *See id.* at 923. "Regardless of how the Court would resolve the question of whether a state law requiring circulators to be state residents is constitutional, the fact remains that the signatures would be excluded on the grounds of several forms of fraud on the part of circulators. Thus, the Court finds that Plaintiffs have failed to meet a threshold requirement for this Court to even consider the constitutional issue." *Ibid.* Citing the canon that courts should avoid deciding constitutional issues unnecessarily, the court held that because Blackwell "invalidated the challenged names on the independent basis of fraud, this Court declines to address Plaintiffs' constitutional

challenge to R.C. § 3503.06." *Id.* at 924.[3] The district court further held that the doctrine of "unclean hands" precluded injunctive relief for Nader, because the "magnitude of the fraud described [in Quinn's report] are [sic] far too great for this Court to consider granting the equitable relief . . . in the Plaintiff's favor." *Ibid.*

The day of the district court decision, the relators filed for an emergency injunction and expedited appeal in the Sixth Circuit. A panel of this court held that the relators' claim "fails primarily because they cannot demonstrate a likelihood of success on the merits." *Blankenship v. Blackwell*, No. 04-4259, 2004 WL 2390113, at *1 (6th Cir. Oct. 18, 2004) (per curiam). Blackwell "had state statutory grounds independent of the registration and residency requirements to reject the disputed circulators' petitions: election falsification, a felony in Ohio." *Ibid.* (citing Ohio Rev. Code Ann. §§ 3501.39(A)(3), 3599.36). Given the evidence of fraud, the panel declined to address the First Amendment challenge.

The relators then filed a timely notice of appeal from the district court judgment on October 13, 2004,[4] and that appeal was submitted on October 26, 2005, and decided on November 16. In their appeal, the relators asked this court to vacate the district court's judgment dismissing their case and to grant them a declaratory judgment that Ohio's residency and registration requirements for circulators violate the First Amendment. *See Blankenship v. Blackwell*, 429 F.3d 254, 257 (6th Cir. 2005). The relators admitted that their request for an injunction to get Nader on the ballot was moot, since the election had already occurred. *See ibid.* They argued that their request for declaratory judgment was not moot, but Judge Batchelder, writing for the panel, with Judges Keith and Oberdorfer concurring, held that because the district court's dismissal of the declaratory judgment claim was based on its resolution of the "now-moot ballot access claim," the only way the panel could address the declaratory claim was to vacate the district court's "now moot judgment solely for the sake of reviewing [the relators'] declaratory judgment claim." *See ibid.* The court declined to grant the relators the "extraordinary equitable remedy of vacatur" and noted that the relators had chosen to "test the limits of the residency requirement" by employing out-of-state circulators who misstated their residencies rather than challenging the residency requirement as unconstitutional "from the very start." *Id.* at 258-59. The appeal was held to be moot and dismissed for lack of jurisdiction. *See id.* at 259.

## C

The case now pending before us began when Nader himself filed suit against Blackwell on September 28, 2006. Nader sought "Nominal Damages from [Blackwell], in his individual capacity, for [Blackwell's] violation of the First and Fourteenth Amendments." Nader alleged that Blackwell's application of Ohio Revised Code § 3503.06 to his petition violated the federal constitution, and that Blackwell was liable under § 1983 for actions taken under color of Ohio law for nominal damages in the sum of one dollar, costs, attorney's fees, and any additional relief the court deemed just.

The district court granted Blackwell's motion to dismiss for failure to state a claim on September 19, 2007. First, the district court questioned whether Nader had standing to sue under Article III. "Given the passage of time since [Blackwell removed Nader from the ballot], the Court is not convinced that Plaintiff has articulated the sort of 'injury in fact' sufficient to confer standing

---

[3] The district court noted that it would have reached the constitutional issue if the circulators had not given false residences, had admitted to being out-of-state residents, and had then challenged the residency requirement "untainted by fraud." *See id.* at 923 n.14.

[4] On October 25, 2004, the Supreme Court denied an application for an injunction pending appeal. *Blankenship v. Blackwell*, 453 U.S. 951 (2004).

for purposes of Article III." The court noted that although Nader sought nominal damages, the "real relief that Plaintiff seeks is that the Court find R.C. § 3503.06 unconstitutional." The district court then referenced its earlier discussion regarding constitutional avoidance from its 2004 decision denying Blankenship's request for injunctive relief and stated that it "found no reason to depart from this analysis simply because Plaintiff Nader seeks to hold the former Secretary of State individually liable for the action of removing Plaintiff from the ballot in 2004." Thus, the court held that Nader had failed to satisfy Article III's standing requirement.

Second, the court held that even if Nader had standing, Blackwell enjoyed qualified immunity. The district court reiterated the finding from the prior litigation that "the decision to remove Plaintiff from the ballot in 2004 was based upon a finding that Plaintiff's petition circulators had committed massive fraud by lying about their residency status . . . ." The district court adhered to its view that Blackwell had not relied on § 3503.06 in invalidating Nader's signatures. Therefore, the court held that Nader had not shown a violation of his constitutional rights.

Third, the court held that Blackwell was entitled to absolute immunity. The court held that absolute immunity applied because the Quinn hearing was "sufficiently adjudicative in nature to confer absolute immunity." The court noted that the hearing included presentation of evidence and testimony, that Quinn issued written findings of fact and conclusions of law, and that the relators had the right to, and did in fact seek, a writ of mandamus in response to Blackwell's decision.

Accordingly, the district court dismissed Nader's complaint and entered judgment in Blackwell's favor. Nader timely appealed that judgment, and the case is now before this panel.

## II

We review de novo the district court's decision to grant defendant Blackwell's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). "A motion to dismiss for failure to state a claim is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). Accordingly, we construe the complaint in the light most favorable to the non-moving party, Nader, and accept all of his factual allegations as true. *See Dubay v. Wells*, 506 F.3d 422, 427 (6th Cir. 2007). The factual allegations in a complaint need not be detailed: they "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 127 S. Ct. 2197, 2199 (2007) (internal quotations and citations omitted).

## III

This suit is a civil action for money damages against Blackwell in his personal capacity. It is not another chance for Nader to litigate the constitutionality of § 3503.06, the constitutionality of which is being challenged directly in other cases.[5] Nor is it a chance for Nader to relitigate Quinn's factual findings. The district court gave three independent reasons for dismissing Nader's suit – lack of standing, qualified immunity, and absolute immunity. Because we hold below that Nader has standing to bring this suit, we must decide whether Blackwell has qualified immunity, and as part of that analysis, we must decide whether Blackwell violated Nader's rights when he applied § 3503.06 to Nader's petition circulators.

---

[5]We note that a district court has issued a preliminary injunction preventing Ohio's Secretary of State from enforcing the current version of § 3503.06 against circulators of nominating petitions for any candidate for President of the United States. *See Moore v. Brunner*, No. 2:08-cv-224, 2008 WL 2323530, at *5 (S. D. Ohio Jun. 2, 2008). Proceedings in that case are ongoing.

### A. Standing

A plaintiff seeking to invoke the jurisdiction of the federal courts "must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "The irreducible constitutional minimum of standing contains three requirements[:] . . . injury in fact, causation, and redressability." *Steel Co. v. Citizens For a Better Environment,* 523 U.S. 83, 102-03 (1998); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). "[I]njury in fact' [is] a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Steel Co.,* 523 U.S. at 103 (citation and quotation marks omitted). Causation is "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Ibid.* Redressability is "a likelihood that the requested relief will redress the alleged injury." *Ibid.*

In this case, there is little argument that Nader's removal from the ballot constitutes an injury-in-fact and that Blackwell's conduct caused the alleged injury.[6] To allege a sufficient injury under the First Amendment, a plaintiff must establish that he or she is subject to a government power that is regulatory, proscriptive, or compulsory in nature. *Laird v. Tatum,* 408 U.S. 1, 11 (1972). Here, Blackwell regulated and proscribed Nader when he applied § 3503.06 to Nader's petitions, invalidated 1701 signatures because circulators failed to comply with § 3503.06, and then removed Nader from the ballot. Removal from the ballot surely constitutes a cognizable injury-in-fact. *See Duke v. Cleland*, 5 F.3d 1399, 1403 n.3 (11th Cir. 1993); *Kay v. Austin*, 621 F.2d 809, 812 (6th Cir. 1980).

In addition, we find the Seventh Circuit's analysis in a similar election case, *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000), particularly persuasive. The Seventh Circuit held that the plaintiffs, who were political candidates, had standing to challenge Illinois's circulator registration and residency requirements, even though the candidates had actually acquired enough valid signatures to appear on the ballot. *See id.* at 857-58. The court reasoned that the candidates had been injured in two ways. First, "being denied use of non-registered, non-resident circulators, they were required to allocate additional campaign resources to gather signatures and were deprived of the solicitors (political advocates) of their choice. This in itself can be an injury to First Amendment rights." *Krislov*, 226 F.3d at 857 (citing *Meyer v. Grant*, 486 U.S. 414, 424 (1988)). Second, "because they were prohibited from using non-registered and non-resident circulators, they were limited in the choice and number of people to carry their message to the public." *Ibid.* As *Meyer* makes clear, limiting the size of a candidate's audience and reducing the amount of speech about his views that he can generate is a cognizable injury. *See Meyer*, 486 U.S. at 421-22.

Turning to Nader's case, he too has standing. As noted above, removal from the ballot certainly constitutes a cognizable injury. Moreover, like the plaintiffs in *Krislov*, Nader was denied the use of the circulators of his choice, and Nader's potential audience and the amount of speech about his views that he could generate was limited when Blackwell applied § 3503.06 to his

---

[6] In his briefs, Nader implies that he is also suing Blackwell for telling the local election boards to review his signatures, resulting in the initial invalidation of 8009 signatures. However, Blackwell's conduct in telling the boards to review Nader's signatures is not at issue in this suit. First, Nader has no evidence of the basis for any of those 8009 invalidations. As the district court noted when it denied the preliminary injunction, since Nader can't establish how many, if any, of those 8009 signatures were invalidated because of the challenged circulator-residency requirement, he cannot show that invalidation of that requirement would have brought him back over the 5000 signature threshold. *See Blankenship*, 341 F. Supp. 2d at 916 n.6. Second, Blackwell cannot be held responsible for the conduct of local election boards because there is no respondeat superior liability under § 1983. *See Skinner v. Govorchin*, 463 F.3d 518, 525-26 (6th Cir. 2006). Third, the election boards have not been joined as defendants in this suit, nor can they be, because any claims against them are time-barred. Nader filed his complaint on September 28, 2006, more than two years after the boards acted on September 8, 2004. *See Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989) (en banc) (holding that a two-year statute of limitations applies to § 1983 actions arising in Ohio).

petitions.  It is also clear that Nader's alleged injury is fairly traceable to Blackwell's conduct.  Indeed, but for Blackwell's decision to apply § 3503.06 and invalidate 1701 of Nader's signatures, Nader would have remained on the ballot.  Finally, monetary damages against Blackwell would compensate Nader for his past injury.  *Cf. Lyons*, 461 U.S. at 106-13 (distinguishing between standing to pursue prospective and retrospective relief).  To survive a Rule 12(b)(6) motion, factual allegations must be enough raise a right to relief above the speculative level.    *See* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004).  In his complaint, Nader sought nominal damages and any additional relief the court deemed just.  Nominal damages suffice to redress a § 1983 claim.  *See Carey v. Piphus*, 435 U.S. 247 (1978) (holding that, absent evidence of actual injury, a plaintiff may recover nominal damages under § 1983).  In his briefs to this court, Nader goes one step further and states that he also intends to seek compensation for the extra expenses he incurred in a late bid to comply with § 3503.06 and for emotional harms he suffered as a result of Blackwell's conduct.  Such damages would redress at least some of Nader's alleged injuries.

In discussing standing, the district court stated that the passage of time between the 2004 election and this suit had weakened Nader's articulation of an injury in fact.  We disagree with this analysis.  In this case, the passage of time may preclude Nader from being placed on Ohio's 2004 election ballot, but it does not mean that Nader may not seek compensation for past injuries.  Thus, despite the district court's doubts, we hold that Nader has standing to pursue this civil suit for money damages against Blackwell.

## B. Qualified Immunity

Given our holding that Nader has standing to sue Blackwell, we turn to the question of whether Blackwell nevertheless enjoys qualified immunity from suit.  We hold that the application of § 3503.06 to Nader's petition circulators violated Nader's First Amendment rights and that Blackwell is chargeable with having enforced the law.  However, we also hold that the right was not clearly established when Blackwell acted.  Accordingly, Blackwell is immune from suit.[7]

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity involves a two-step inquiry.  *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Bouggess v . Mattingly*, 482 F.3d 886, 887 (6th Cir. 2007).  First, the court must ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  If the answer is yes, then the court must go on to ask whether the right was clearly established.[8]  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."  *Id.* at 202; *see also Dominique v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987) (stating that qualified

---

[7]Although one might think that other cases could shed light on this issue, we could not locate any cases like this one, in which a plaintiff seeks redress for a state statute violating his constitutional rights by suing a state officer in his personal capacity for money damages.  In the usual suit challenging a state law's constitutionality, a plaintiff sues a state officer in his official capacity, and the plaintiff seeks injunctive relief based on a declaration of a statute's unconstitutionality.  *See generally* Richard H. Fallon, Jr., et al., Hart & Wechsler's The Federal Courts and the Federal System 1084-86 (5th ed. 2003).

[8]This ordering has been criticized, *see, e.g.*, *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (noting that "this ordering contradicts our policy of avoiding unnecessary adjudication of constitutional issues") (internal quotation marks omitted), and the Supreme Court has recently invited parties in a new case to brief the issue of whether *Saucier* should be overruled, *see Pearson v. Callahan*, 128 S. Ct. 1702 (2008) (mem.).  Of course, unless and until *Saucier* is overruled, we will continue to adhere to it.

immunity applies unless "*any officer* in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct") (emphasis added).

The first part of our inquiry – whether Blackwell violated Nader's First Amendment rights when he applied § 3503.06 to Nader's petition – requires an examination of the statute itself.  At the time Blackwell acted, § 3503.06 stated:

> No person shall be entitled to vote at any election, or to sign or circulate any declaration of candidacy or any nominating, initiative, referendum, or recall petition, unless the person is registered as an elector and will have resided in the county and precinct where the person is registered for at least thirty days at the time of the next election.

Ohio Rev. Code Ann. § 3503.06 (West 2004).  Thus, § 3503.06 imposes both a residency and a registration requirement.  The two requirements are separate, but the registration requirement is related to the residency requirement: one must have been a resident for thirty days in the precinct where one is registered.

Quinn's findings, which Blackwell adopted, reflect her application of both the residency and registration requirements to Nader's circulators.  In discussing Daryl Oberg's status as "an Ohio resident and elector," Quinn determined that Oberg lacked a "qualifying voting residence" and invalidated the 341 signatures that he collected.  Regarding George Woods, Quinn determined that he had been registered to vote in Texas since February 2004, concluded that he "is not an Ohio resident," and invalidated the 44 signatures that he collected.  Regarding John M. Laws, Quinn noted that he had registered to vote in California and cited this court's case law for the proposition that persons who were not legitimate residents at their stated address were improperly registered and ineligible to vote.  Quinn concluded that "John Laws is not an Ohio resident, and thus lacks a necessary qualification to be an Ohio elector."  She invalidated 544 signatures that he collected.  Finally, Quinn's findings regarding Steven Laws also reflect the dual requirements of residency and voter registration under § 3503.06.  Quinn found that Steven Laws had registered to vote in California, and that by voting in California, he "ceased to be an Ohio elector by operation of law."  Therefore, she concluded, he "could not be a qualified elector of Ohio unless he re-established a qualifying *voting residence in Ohio, registered to vote at that Ohio address*, and otherwise satisfied Ohio's voter eligibility requirements."  (emphasis added).

Although Nader argues that Blackwell's application of § 3503.06's residency requirement is the problem, both the law's text and Quinn's application of the law, which Blackwell adopted, make it clear that is more correct to say that § 3503.06 imposes both a registration and a residency requirement.  No circulator was rejected for being a legitimate resident, but not a registered voter.  Thus, the question before us is whether Blackwell's application of the two requirements violated Nader's First Amendment rights.  We conclude that it did.

The most relevant case is *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), in which the Supreme Court held that Colorado's requirement that circulators of *initiative* petitions be registered Colorado voters was unconstitutional.[9]  The Court reiterated that petition circulation is "'core political speech', because it involves 'interactive communication concerning political change.'"  *Id*. at 186 (quoting *Meyer v. Grant*, 486 U.S. 414, 422 (1988)).  First Amendment protection for such interaction is "at its zenith."  *Ibid*.; *see also McCloud v. Testa*, 97 F.3d 1536, 1552 (6th Cir. 1996) ("Political association is at the core of the First Amendment, and

---

[9]Colorado law similarly provided that only registered voters could circulate candidate nominating petitions, but the Court's decision addressed only the law regarding initiative petitions. *See Buckley*, 525 U.S. at 193 n.13.

even practices that only potentially threaten political association are highly suspect."). The Court found that a registration requirement "drastically reduces the number of persons, both volunteer and paid, available to circulate petitions." *Id.* at 193. Applying strict scrutiny, *id.* at 192 n.12, the Court concluded that Colorado's in-state registration requirement "cuts down the number of message carriers in the ballot-access arena without impelling cause," *id.* at 197, and held that the requirement was unconstitutional.

We hold that Blackwell violated Nader's First Amendment rights when he enforced Ohio's registration and residency requirements against Nader's candidate-petition circulators. We are mindful that the distinction between legitimate ballot access regulations and improper restrictions on interactive political speech is not subject to a "litmus-paper test." *Anderson v. Celebrezze*, 460 U.S. 780. 789 (1983). Instead, a particularized assessment of the restriction and the burden it imposes is required. In this case, as in *Buckley*, Nader's petition circulation activity constitutes core political speech, and any regulation of that speech is subject to exacting scrutiny. *See Buckley*, 525 U.S. at 192 n.12; *id.* at 210-11 (Thomas, J., concurring) (applying strict scrutiny because registration requirement impacted core political speech). Because of the unusual posture of this case, the record and briefs do not contain the usual evidence and arguments about whether Ohio's law is narrowly tailored to achieve a compelling interest.[10] However, it is undisputable that Blackwell's conduct sharply limited Nader's ability to convey his message to Ohio voters and thereby curtailed Nader's core political speech. Under Blackwell's application of § 3503.06 to Nader's petitions, Nader could only use circulators who resided in Ohio and were properly registered to vote in Ohio. In requiring such from Nader, Blackwell violated Nader's right to use petition circulators who were not Ohio residents and registered Ohio voters. *See also Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (noting that Arizona's in-state residency requirement for circulators "excludes from eligibility all persons who support the candidate but who . . . live outside the state of Arizona. Such a restriction creates a severe burden on . . . speech, voting and associational rights.").

We must decide the extent to which the principles that *Buckley* established regarding initiative-petition circulators and registration requirements may be extended. There appears to be little reason to limit *Buckley*'s holding to initiative-petition circulators. As the Supreme Court noted: "Initiative-petition circulators also resemble candidate-petition signature gatherers . . . for both seek ballot access." *Buckley*, 525 U.S. at 191. Indeed, common sense suggests that, in the course of convincing voters to sign their petitions, candidate-petition circulators engage in at least as much "interactive political speech" – if not more such speech – than initiative-petition circulators. Some of our sister circuits have concluded the same and have applied *Buckley* to invalidate state laws requiring that candidate-petition circulators be registered voters. *See Lerman v. Bd. of Elections*, 232 F.3d 135, 148 (2d Cir. 2000) (stating that there was "no basis to conclude" that the level of interactive political speech of candidate- and intiative-petition circulators differed); *Krislov*, 226 F.3d at 861-62 (noting that the burden on candidates is even greater than the burden on initiative proponents because a candidate's circulators must "speak to a broader range of political topics"); *see also Nader*, 531 F.3d at 1035-36 (applying *Buckley* to case involving candidate-petition circulators). We agree with these courts that we should not categorically exclude candidate-petition circulators from *Buckley*'s analysis of registration requirements. Thus, we hold that Blackwell's enforcement of the registration requirements against Nader's circulators violated Nader's First Amendment rights.

Looking then to the residency requirements, which would be implicated to the extent that circulators had not registered to vote *and* were not residents of Ohio, we see little reason to uphold

---

[10]In his briefs to this court, Blackwell's only argument that his actions did not violate Nader's constitutional rights is that his decision to remove Nader from the ballot was justified on independent grounds that Nader's circulators had committed fraud. Appellee's Br. at 17-18. This argument fails because, as noted above, we proceed on the basis that it was not falsification, but enforcement of § 3503.06, that brought Nader below the 5000-signature threshold.

the exclusion of such persons from the ranks of circulators. The interest in permitting greater amounts of speech is the same. No case has been put forward in this litigation as to a compelling state interest in permitting unregistered Ohioans to circulate petitions but not unregistered citizens of other states. Thus, we hold that the enforcement of the residence requirement as well violated Nader's constitutional rights.

Having concluded that Nader's constitutional rights were violated, we now must determine whether the law regarding those rights was clearly established. *See Bouggess*, 482 F.3d at 894; *see also Saucier*, 533 U.S. at 202. Qualified immunity shields an official from suit even when his action violates constitutional rights, unless "the right is so clearly established that a reasonable official would understand that what he was doing violates that right." *Cooper v. Parish*, 203 F.3d 937, 951 (6th Cir. 2000) (quotation marks omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987). ("[O]fficials who act in ways they reasonably believe to be lawful . . . should not be held personally liable.") "The standard is one of objective reasonableness, analyzing claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995).

A review of the *Buckley* case and subsequent circuit cases indicates that the law regarding Blackwell's conduct was not clearly established. Importantly, the *Buckley* Court itself specifically left open the question of whether a residency requirement would be constitutional. *See* 525 U.S. at 197 ("[A]ssuming that a residence requirement would be upheld as a needful integrity-policing measure – [it is a] a question we . . . have no occasion to decide because the parties have not placed the matter of residence at issue . . . .") (citation omitted).

Concurring separately, Justice Thomas assumed that "the State has a compelling interest in ensuring that all circulators are residents" and concluded: "Even so, it is clear . . . that the registration requirement is not narrowly tailored." *See id.* at 211 (Thomas, J., concurring). By contrast, Chief Justice Rehnquist noted that, although the majority had maintained a "sphinx-like silence as to whether [a State] may even limit circulators to state residents," it was his understanding that the Court's holding extended to residency requirements also. *Id.* at 228 (Rehnquist, C.J., dissenting). Explaining the possible reach of the Court's opinion, Rehnquist warned: "And if initiative petition circulation cannot be limited to electors, it would seem that a State can no longer impose an elector or residency requirement on those who circulate petitions to place candidates on ballots, either." *Id.* at 232 (Rehnquist, C.J., dissenting).

Nevertheless, the dissenting Chief Justice's trepidations about the possible future expansion of *Buckley* cannot create a clear holding about residency requirements where none existed. The fact that the Court maintained its "sphinx-like silence" about residency requirements should preclude us from finding that *Buckley* had clearly established a general rule against such requirements. *Cf. Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001) (noting that *Buckley* did not squarely confront the issue of residency requirements and upholding a residency requirement for initiative-petition circulators).

Indeed, other Supreme Court precedent counsels strongly against the view that *Buckley* created any bright-line rule against residency requirements of which a reasonable official should have been aware. The Court has admonished that there are no litmus-paper tests for deciding when a legitimate ballot-access regulation has crossed the line and impermissibly burdens free speech. *See Anderson*, 460 U.S. at 789; *see also Buckley*, 525 U.S. at 192 ("We have several times said no litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions; we have come upon no substitute for the hard judgments that must be made." (internal quotation marks omitted)); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 ("No bright line separates permissible election-related regulation from unconstitutional infringements on First

Amendment freedoms."). Sometimes a case will arise that is sufficiently like a past case that the hard judgments are made easier. *See, e.g.*, *Krislov*, 226 F.3d at 861. Even then, close analysis of the particular facts of the case is required. Indeed, we note that the *Buckley* Court, in striking down the registration requirement, cited statistical evidence about Colorado voter registration and not residency data. *See, e.g.*, 525 U.S. at 193 n.15.

Our sister circuits have heeded the Court's warning against litmus-paper tests, have carefully examined any challenged residency and registration requirements, and have divided as to their constitutionality. The Seventh Circuit applied *Buckley* and struck down a registration requirement (that also had the effect of imposing a residency requirement) for candidate-petition circulators. *See Krislov*, 226 F.3d at 866. By contrast, the Eighth Circuit flatly upheld a state-residency requirement for initiative-petition circulators. *See Jaeger*, 241 F.3d at 618. The Second Circuit took an intermediate position, striking down a requirement that candidate-petition circulators reside in the district in which the candidate was running for office, but approving New York's in-state residency requirement in dicta. *See Lerman*, 232 F.3d at 150. Clearly, *Buckley* has not resulted in the automatic invalidation of residency requirements for petition circulators. Given the split among the circuit courts, we cannot say that every reasonable official charged with enforcing § 3503.06 would have clearly understood that he was under an affirmative duty to cease enforcing the residency requirement.

State regulations and the burdens they create must be individually investigated, not least because regulations differ markedly. Here, § 3503.06 imposed both a residency and a registration requirement, in which registration requires residency. We concluded above that § 3503.06 effectively imposed both unconstitutional requirements on Nader's circulators. However, we cannot say that Blackwell's enforcement of the statute as written was an act that every reasonable secretary of state would have known was unconstitutional.

Given our holding that Blackwell has qualified immunity from suit, it is unnecessary for us to decide whether he also enjoys absolute immunity.

**IV**

Therefore, for the reasons set out above, we AFFIRM the judgment of the district court.

---

**CONCURRING IN PART AND CONCURRING IN THE JUDGMENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and concurring in the judgment. I write separately to clarify our holdings today. First, we hold that Nader has standing to challenge the constitutionality of the voter-registration and residency requirements contained in Ohio Rev. Code § 3503.06.[1] Accordingly, we consider the merits of Nader's constitutional claims. We hold that the voter-registration requirement contained in Ohio Rev. Code § 3503.06 is a severe restriction on political speech which cannot survive strict scrutiny. Similarly, we hold that the residency restriction in § 3503.06 severely limits political speech and is not justified by a sufficient state interest. Therefore, we hold that the voter-registration restriction and the residency restriction contained in § 3503.06 are both unconstitutional in violation of the First Amendment. Finally, we conclude that because these violations were not clearly established in 2004, Blackwell is entitled to qualified immunity.

I also concur in Judge Clay's opinion, making his opinion the opinion of the court. Judge Clay joins my opinion, making this the opinion of the court.

---

[1] The hearing officer excluded some signatures based on an explicit finding of fraud. Lead Op. at pp. 3-4. However, as the lead opinion explains, even when these signatures were excluded, Nader had enough signatures to qualify for the ballot. *Id.* Nader's removal from the ballot resulted from the exclusion of signatures gathered by four circulators based on findings that these circulators were not Ohio residents or properly registered voters. *Id.* at pp. 4-6. Therefore, Nader's injury is attributable to the requirements contained in § 3503.06 and would be redressed by a decision in Nader's favor.

---

### CONCURRING IN PART AND CONCURRING IN THE JUDGMENT

---

CLAY, Circuit Judge, concurring in part and concurring in the judgment. I share Chief Judge Boggs' views of most of the issues presented in this case, and write separately only to address a few passages in the lead opinion which I fear are likely to confuse future judges citing to *Nader v. Blackwell* as binding precedent.

First, the lead opinion states that "[t]his suit is a civil action for money damages against Blackwell in his personal capacity. It is not another chance for Nader to litigate the constitutionality of § 3503.06, the constitutionality of which is being challenged directly in other cases." Lead Op. at 9. The lead opinion does nothing, however, to explain why the fact that Nader currently seeks only money damages somehow diminishes the implications of our holding that Ohio Revised Code § 3503.06 treads too far on constitutionally protected activity. As we correctly hold, "petition circulation activity constitutes core political speech, and any regulation of that speech is subject to exacting scrutiny." Lead Op. at 13. The fact that we reach this holding in resolving a particular plaintiff's claim for money damages does not diminish its applicability to all future cases, and judges bound by the Sixth Circuit's decisions must treat *Nader v. Blackwell* as they would any other published opinion of this Court.

Moreover, regardless of whether or not Nader has "directly" challenged the constitutionality of § 3503.06, Nader does raise a First Amendment challenge, and First Amendment challenges are governed by the overbreadth doctrine. Under that doctrine, a First Amendment plaintiff "may prevail on a facial attack by demonstrating there is 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court.'" *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 135 (6th Cir. 1994) (quoting *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 801 (1984)). Thus, upon our declaration that portions of § 3503.06 are unconstitutional as applied to Ralph Nader, any subsequent plaintiff who challenges the same provisions may prevail, even if the statute is not unconstitutional as applied to them. In other words, our decision that § 3503.06 is unconstitutional as applied to Ralph Nader has the same practical effect as a declaration that the portions of § 3503.06 which Nader challenges are facially unconstitutional, because any future litigant who raises a First Amendment challenge to the provisions challenged by Nader may prevail by noting that § 3503.06 "significantly compromise[s]" the recognized First Amendment rights of Ralph Nader. *Id.* Nothing in this Court's holding should be understood to abrogate the overbreadth doctrine.

I join Chief Judge Boggs' opinion only insofar as it does not conflict with the views expressed in this concurring opinion and Judge Moore's concurring opinion. I also join Judge Moore's opinion.