RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0013p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CITIZENS IN CHARGE, INC.; OHIOANS FOR WORKPLACE FREEDOM; CHRISTOPHER LITTLETON; CINCINNATI FOR PENSION REFORM,

        *Plaintiffs-Appellees,*

    *v.*

JON HUSTED, Ohio Secretary of State,

        *Defendant-Appellant.*

No. 15-3447

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:13-cv-00935—Michael H. Watson, District Judge.

Argued: December 10, 2015

Decided and Filed: January 19, 2016

Before: COLE, Chief Judge; SUTTON, Circuit Judge; BELL, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Ryan L. Richardson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Maurice A. Thompson, 1851 CENTER FOR CONSTITUTIONAL LAW, Columbus, Ohio, for Appellees. **ON BRIEF:** Ryan L. Richardson, Tiffany L. Carwile, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant. Maurice A. Thompson, 1851 CENTER FOR CONSTITUTIONAL LAW, Columbus, Ohio, for Appellees.

---

[*]The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

---

**OPINION**

---

SUTTON, Circuit Judge. Ohio, like many States, has an initiative process that permits individuals or groups to propose new legislation and constitutional amendments. *See* Ohio Const. art. II, §§ 1a, 1b. If an initiative proposal secures enough signatures, it earns a spot on the next ballot, where Ohio voters may accept or reject it. *Id.* The catch is that state law requires all signature gatherers to be Ohio residents. *See* Ohio Rev. Code § 3503.06(C)(1)(a). Plaintiffs challenged the residency requirement on First (and Fourteenth) Amendment grounds, claiming that our court's invalidation of a prior Ohio statute in this area required the invalidation of this one. *See Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008). The plaintiffs sought to enjoin enforcement of the new law and to make the Ohio Secretary of State personally liable for several thousand dollars for enforcing it. The district court declared the law unconstitutional, enjoined enforcement of it, and denied the Secretary's qualified-immunity defense. In this interlocutory appeal, the Secretary challenges the qualified-immunity ruling but not the injunction (or the ruling of invalidity that goes with it). Because the Ohio legislature made several changes to these signature-gathering requirements after *Nader* and because the Secretary had no clearly established duty to decline enforcement of this properly enacted and presumptively constitutional statute, we reverse.

I.

The Ohio General Assembly enacted this provision in 2013. It says: "Except for a nominating petition for presidential electors, no person shall be entitled to circulate any petition unless the person is a resident of this state and is at least eighteen years of age." Ohio Rev. Code § 3503.06(C)(1)(a). Shortly after the provision took effect, counsel for three non-profit organizations wrote to Secretary of State Jon Husted, asking whether he planned to "reject[] petitions where the circulator is domiciled in a state other than Ohio[.]" R. 1-3 at 6. "While a court may ultimately find this law unconstitutional," Secretary Husted responded, "that determination is a decision for the judicial branch, not the Secretary of State. As a result, this

office and county boards of election will implement this law like any other until such time as the legislature acts to make a statutory change or a court directs otherwise." *Id.* at 8.

At that point, one of the non-profit groups hired a firm to help gather signatures for an initiative petition, paying a higher-than-usual fee to ensure that the firm hired in-state signature gatherers. Then all three non-profit organizations, along with one of their members, sued Secretary Husted in federal court. They sought a declaration that the petition-circulator residency requirement was unconstitutional, an injunction prohibiting its enforcement, and damages against Husted "as compensation for extra petition circulation charges." R. 1 at 15. The Attorney General intervened to defend the law's constitutionality on behalf of the State, and Husted argued that qualified immunity protected him from the plaintiffs' damages claim. The district court saw things differently. It granted the plaintiffs a permanent injunction and denied Husted's qualified-immunity motion. On appeal, Husted challenges the qualified-immunity ruling but not the injunction.

II.

The qualified-immunity standard is a familiar one. The doctrine "shield[s]" public officials from money-damages liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The standard balances competing considerations: At one end, damages actions may be "the only realistic avenue for vindication of constitutional guarantees"; at the other end, damages actions "frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to society as a whole." *Id.* at 814. Public officials thus are eligible for qualified immunity if (1) they did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009). Both inquiries are "objective," as they turn on what the law is today and whether it was clearly established at the time of the challenged action. *Harlow*, 457 U.S. at 818–19.

A.

*Constitutional violation*?   At this stage in the case, neither the Attorney General nor the Secretary claims that the residency requirement satisfies the First Amendment.   They instead maintain that the Secretary never enforced the statute in a way that caused the plaintiffs any damages.   In response to an inquiry from the plaintiffs, Secretary Husted said that he would enforce the statute until directed by a court to do otherwise.   Because the plaintiffs thereafter obtained an injunction against enforcement of the statute, it is difficult to understand how they can blame the Secretary for any costs incurred by hiring in-state signature gatherers.   If anything, Husted's letter told the plaintiffs how to avoid incurring the costs of compliance with the statute: file a lawsuit to enjoin its enforcement.   That would have worked just fine, as later events confirmed.   In response to the lawsuit, the district court declared the statute invalid, the court enjoined enforcement of the statute, and the Secretary opted not to appeal that part of the court's decision.

The plaintiffs nonetheless chose to incur costs based on hiring resident petition circulators *before* filing the lawsuit.   They of course are free to presume the constitutionality of a statute (many people do) and incur costs based on that assumption.   What is not clear is whether that means the Secretary of State *caused* them to suffer damages by violating their constitutional rights in this setting.   Be that as it may, we need not resolve the case on this ground—a ground that was not fully engaged by the parties below and thus not addressed by the district court.   Any such rights, as it turns out, were not clearly established at the time Secretary Husted wrote his letter to the plaintiffs.

B.

*Clearly established right*?   At the time Husted acted, no court had declared this residency requirement unconstitutional and he acted reasonably in saying he would enforce it.   When public officials implement validly enacted state laws that no court has invalidated, their conduct typically satisfies the core inquiry—the "objective reasonableness of an official's conduct"—that the immunity doctrine was designed to test.   *Harlow*, 457 U.S. at 818.   State legislators swear to uphold the state and federal constitutions, *see* U.S. Const. art. VI, cl. 3; Ohio Const. art. XV, § 7, and a presumption of constitutionality accompanies their enactments, *see Heller v. Doe*, 509 U.S.

312, 320 (1993)—a presumption on which executive officials generally may depend in enforcing the legislature's handiwork. State law encourages such reliance, with the Ohio Supreme Court noting with a touch of overstatement (more on that later) that "[t]he secretary of state is not vested with any jurisdiction to determine judicial questions dealing with the constitutionality of any law." *Maloney v. Rhodes*, 345 N.E.2d 407, 410 (Ohio 1976) (quotation omitted). Because Secretary Husted acted in the face of legislative action (a duly enacted, presumptively constitutional law) and judicial inaction (the absence of an on-point decision making the law unconstitutional), he did not violate clearly established law or otherwise act unreasonably.

Caselaw validates this conclusion. The Supreme Court tells us that public officials should generally receive qualified immunity when enforcing properly enacted laws. *See Michigan v. DeFillippo*, 443 U.S. 31 (1979). In *DeFillippo*, the Court addressed what came to be known as the Fourth Amendment's good-faith exception, which requires the same "objective reasonableness" showing that the qualified-immunity inquiry demands. *See Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004); *United States v. Leon*, 468 U.S. 897, 911–12 (1984). The Court noted that "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and fragrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *DeFillippo*, 443 U.S. at 38. The Court was more explicit in *Pierson v. Ray*, 386 U.S. 547 (1967). "A policeman's lot is not so unhappy," it reasoned, "that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *Id.* at 555.

The Court's deeds have matched its words. So far as the parties' research has revealed and so far as our own research has uncovered, the Supreme Court has *never* denied qualified immunity to a public official who enforced a properly enacted statute that no court had invalidated. This indeed would seem to be the paradigmatic way of showing objectively reasonable conduct by a public official.

Our court has adopted similar reasoning in granting qualified immunity to public officials who enforced validly enacted laws. *See Risbridger v. Connelly*, 275 F.3d 565, 573–74 (6th Cir. 2002); *Hanna v. Drobnick*, 514 F.2d 393, 397 (6th Cir. 1975), *repudiated on other grounds by*

*Thomas v. Shipka*, 818 F.2d 496 (6th Cir. 1987); *cf. Wolfel v. Morris*, 972 F.2d 712, 719–20 (6th Cir. 1992). Other circuits have done the same, treating the fact that an officer enforced a presumptively constitutional law as creating "a heavy presumption in favor of qualified immunity." *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 104 (2d Cir. 2003); *see Swanson v. Powers*, 937 F.2d 965, 968–69 (4th Cir. 1991); *Doe v. Heck*, 327 F.3d 492, 516, 525, 527 (7th Cir. 2003); *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994); *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005); *cf. Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002).

Any other approach would place risky pressures on public officials to second-guess legislative decisions. When faced with a statute of questionable validity, executive actors would find themselves forced to choose between applying the law (and subjecting themselves to monetary liability) or declining to do so (and subjecting themselves to a mandamus lawsuit). When personal liability is added to the mix, one could well imagine the balance tipping toward non-enforcement in close cases, all the while sacrificing the legislature's considered judgments about a statute's constitutionality. That is not a recipe for good government or for encouraging public officials to act independently.

None of this should be taken to mean that state officials *must* enforce duly enacted statutes. Just like state legislators and judges, state executive-branch officials swear their *own* "Oath or Affirmation[] to support th[e] [federal] Constitution," U.S. Const. art. VI, cl. 3; *see* 4 U.S.C. § 101, and their state constitution, *see* Ohio Const. art. XV, § 7. The Supremacy Clause "invalidates state laws that interfere with, or are contrary to, federal law." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quotation omitted); *see* U.S. Const. art VI, cl. 2. Executive officials have an "independent obligation[] to interpret and uphold the Constitution," *Boumediene v. Bush*, 553 U.S. 723, 798 (2008), and they may conclude in good faith that a particular statute is unenforceable. In that sense, the Ohio Supreme Court overreached when it said that "the question of [a law's] constitutionality . . . is of a judicial character, not executive," and that the Secretary of State lacks "jurisdiction to determine judicial questions dealing with the constitutionality of any law." *Maloney*, 345 N.E.2d at 410. *Maloney* involved the duty under the Ohio Constitution of the Secretary of State to file duly enacted

legislation. *Id.* That ruling of course does not insulate the Secretary of State from his duty under the United States Constitution to obey federal law. That is just what Secretary Husted's predecessor, Jennifer Brunner, did when she declined to enforce an earlier version of today's statute based on her interpretation of federal law. What Secretary Brunner may do, however, does not prove what Secretary Husted must do.

The enforcement of a presumptively valid law, it is also true, does not automatically entitle officials to qualified immunity. Some laws may be "so grossly and flagrantly unconstitutional" that any reasonable officer would decline to enforce them. *DeFillippo*, 443 U.S. at 38. This exception means that, contrary to plaintiffs' concerns, the Secretary would not receive qualified immunity for enforcing an "involuntary servitude" law or one that required "separate but equal racial accommodations," even if such laws somehow were enacted by the Ohio General Assembly. Appellees' Br. 39. (As it turns out, the Ohio General Assembly's record in this area is not beyond reproach. After ratifying the Fourteenth Amendment in 1867, it voted to undo its ratification vote in 1868, though it re-ratified the amendment in 2003. *See* Gabriel J. Chin, *Ratifying the Fourteenth Amendment in Ohio*, 28 W. New Eng. L. Rev. 179, 179–81 (2006).)

Today's election statute is not a "grossly and flagrantly unconstitutional" law. At the same time that the Tenth Circuit has invalidated residency requirements for initiative-petition circulators, *see Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1025–27, 1031 (10th Cir. 2008); *Chandler v. City of Arvada*, 292 F.3d 1236, 1238–44 (10th Cir. 2002), the Eighth Circuit has upheld such a requirement, *see Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616–17 (8th Cir. 2001). *Jaeger* held that North Dakota's residency restriction advanced the State's "compelling interest in preventing fraud" without "unduly restrict[ing] speech," noting that non-residents had "many alternative means . . . to communicate their views on initiative measures." *Id.* Whether our court would accept the Eighth Circuit's reasoning if presented with the same question matters not. What matters is that the existence of a circuit split by itself amply supports Husted's position that he could reasonably conclude that Ohio's residency requirement was constitutional. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999). If judges can reasonably

disagree about the meaning of the Constitution, we should not punish public officials for reasonably picking one side or the other of the debate.

Also supporting Husted is the nature of the multi-factor, interest-balancing test used to evaluate residency requirements. The Supreme Court has repeatedly warned that, while "the circulation of a petition involves . . . 'core political speech,'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988), "no litmus-paper test . . . separate[s] valid ballot-access provisions from invalid interactive speech restrictions," *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999) (quotation omitted); *see Storer v. Brown*, 415 U.S. 724, 730 (1974). The Court typically proceeds by distinguishing regulations that impose "severe burdens" from those that create "[l]esser burdens"; the former must survive strict scrutiny, while the latter "trigger less exacting review." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The distinction between "severe burdens" and "lesser" ones is often murky, *see Buckley*, 525 U.S. at 207 (Thomas, J., concurring in the judgment), and Husted could reasonably have determined (as the Eighth Circuit did, *see Jaeger*, 241 F.3d at 617) that the residency requirement did not impose a "severe burden" on petition circulators. Even if Husted decided that strict scrutiny applied, he reasonably could have concluded that the regulation survived it (perhaps relying on the Eighth Circuit's statement that residency requirements advance the State's "compelling interest in preventing fraud," *id.* at 616). Courts generally accord public officials wide latitude (for qualified-immunity purposes) when the constitutionality of their acts comes down to the subtleties of interest balancing and narrow tailoring, especially when courts have reached different conclusions on the point. *See Borucki v. Ryan*, 827 F.2d 836, 848 (1st Cir. 1987).

The plaintiffs respond that *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008), seals Husted's fate. True enough, that decision invalidated a prior version of this statute. But it does not resolve today's case. The prior statute read, "No person shall be entitled to . . . circulate any declaration of candidacy or any nominating, initiative, referendum, or recall petition, unless the person is registered as an elector and will have resided in the county and precinct where the person is registered for at least thirty days at the time of the next election." *Id.* at 473 (Boggs, C.J., lead opinion) (quotation omitted). During the 2004 presidential election, the Ohio Secretary

of State enforced this provision to deny ballot access to third-party candidate Ralph Nader, because some of his petition circulators were not Ohio residents or registered voters. *Id.* at 465–67. Nader sued the Secretary and, in the course of *granting* him qualified immunity, the three opinions for the court held the residency and registration requirements unconstitutional. *Id.* at 473–78; *id.* at 478 (Moore, J., opinion for the court); *id.* at 478–79 (Clay, J., opinion for the court). This decision, say the plaintiffs, should have alerted Husted that he could not enforce the amended statute.

*Nader* leans in plaintiffs' direction on the constitutional issue, but it does not show that Husted violated clearly established law. Nader challenged the residency restriction as "applied to circulators working on a presidential candidate's campaign," Appellant's Brief, *Nader*, 545 F.3d 459 (No. 07-4350), 2008 WL 2740667, at *10, and after undertaking a "close analysis of the particular facts of the case," our court invalidated the *specific* residency requirement at issue, 545 F.3d at 476–77 (Boggs, C.J., lead opinion).

The Ohio General Assembly amended the law in response. The new law differs from the old law in several ways. It creates an exemption for presidential nominating petitions (such as the one at issue in *Nader*), meaning that circulators of such petitions need not meet the residency requirement. Ohio Rev. Code § 3503.06(C)(1)(a). And it detaches the residency restriction from the requirement that petition circulators be registered voters, so that circulators no longer need to reside in "the county and precinct" of registration but may instead reside anywhere in the State. *Id.* § 3503.06(A), (C)(1)(a). These revisions confirm the legislature's good-faith attempt to pass a more narrowly tailored law than the one *Nader* invalidated, and Husted could reasonably credit that effort by deciding to enforce the new law.

Husted could fairly believe that the State has a heightened interest in imposing a residency requirement on *initiative* petition circulators, because initiatives enact changes to state or local laws while presidential elections affect the entire nation. Or he could fairly believe, as the Seventh Circuit has suggested, that restrictions on presidential nominating petitions impose greater burdens on speech than restrictions on initiative petitions do. "[T]he ballot initiative proponent will generally seek support for the one narrow issue presented in the initiative, while the typical candidate embodies a broad range of political opinions, and thus those who solicit

signatures on their behalf must speak to a broader range of political topics." *Krislov v. Rednour*, 226 F.3d 851, 861 (7th Cir. 2000). Or he could fairly believe, as the Second Circuit has suggested, that the Ohio General Assembly created a "less burdensome requirement[]" when it expanded the in-*precinct* residency restriction to an in-*state* residency restriction. *See Lerman v. Bd. of Elections*, 232 F.3d 135, 150 & n.14 (2d Cir. 2000). In the face of these variables, Husted could fairly conclude that the new statute would be subject to less-than-strict scrutiny or that, even if strict scrutiny applied, the law was sufficiently narrowly tailored to survive it. Although *Nader* noted that "[i]nitiative-petition circulators . . . resemble candidate-petition signature gatherers," *see* 545 F.3d at 475 (Boggs, C.J., lead opinion) (quoting *Buckley*, 525 U.S. at 191), it did not say that initiative and candidate nominating petitions are identical—or that they are subject to the same First Amendment analysis. If qualified immunity protects all but the "plainly incompetent," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), it protects Husted's reasonable assessment that the legislature's more narrowly tailored statute permitted him to enforce it.

Caselaw from other circuits bolsters this conclusion. *Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 88–89 (2d Cir. 2003), addressed a New York law that imposed limitations on the lobstering permits granted to out-of-state residents. After concluding that the law violated Article IV's Privileges and Immunities Clause, *see id.* at 93–100, the Second Circuit granted qualified immunity to the state officials who had enforced the statute, even though several courts had invalidated a comparable law relating to shellfish permits, *see id.* at 100–09. The court acknowledged that the disparities between the shellfish law and the lobstering law were "distinction[s] without a difference insofar as [the] Privileges and Immunities analysis is concerned." *Id.* at 107. But these disparities nonetheless "mudd[ied] the waters for purposes of qualified immunity by casting doubt in the minds of reasonable officials about whether invalidation of the Nonresident Shellfish Law would translate into invalidation of the Nonresident Lobster Law." *Id.*

The D.C. Circuit reached a similar conclusion when two members of the Capitol Police arrested a protestor who violated the Capitol Police Board's regulations by distributing leaflets in a "no-demonstration zone." *Lederman*, 291 F.3d at 39–40. The court held that the demonstration ban violated the First Amendment, *see id.* at 41–46, but granted qualified

immunity to the arresting officers, *see id.* at 46–48. "While we find the ban's sheer breadth astonishing," the D.C. Circuit said, "we recognize that the Police Board made some attempt at tailoring" by "exempt[ing] expressive tee-shirts and buttons" from the ban. *Id.* at 47. "Although those qualifiers [could not] begin to satisfy the narrow tailoring requirement, . . . their inclusion in the ban [kept] it from being 'so grossly and flagrantly unconstitutional' . . . that the officers should have recognized its flaws." *Id.* (quoting *DeFillippo*, 443 U.S. at 38). Just so here, where the plaintiffs' arguments about the law's unconstitutionality may be winning ones but where the Secretary's decision to *enforce* the law was not objectively unreasonable.

The plaintiffs invoke several out-of-circuit cases that struck down petition-circulator residency requirements. But these cases engaged in fact-intensive analyses to determine that the specific residency requirement at issue was unconstitutional, and most of them arose when circulators of *candidate nominating* petitions challenged the governing statute. *See Lerman*, 232 F.3d at 139, 145–53; *Libertarian Party v. Judd*, 718 F.3d 308, 310–12, 316–19 (4th Cir. 2013); *Krislov*, 226 F.3d at 855–66; *Nader v. Brewer*, 531 F.3d 1028, 1031–32, 1035–38 (9th Cir. 2008). None of these cases put Husted on notice that *Ohio's* revised law was clearly invalid, especially when the Eighth and Tenth Circuits have issued conflicting decisions on the constitutionality of *initiative*-circulator residency requirements. *Compare Jaeger*, 241 F.3d at 616–17, *with Savage*, 550 F.3d at 1025–27, 1031.

The plaintiffs worry that permitting public officials to rely on a presumption of constitutionality will convert qualified immunity into absolute immunity whenever an executive officer enforces a validly enacted law. They note that, while courts have expressed concern about imposing personal liability on police officers who enforce presumptively legitimate statutes, the same anxieties do not apply to the Secretary of State, who has the legal staff and the budget to assess a law's constitutionality. But the *DeFillippo* inquiry does not create an absolute bar, and we may still hold executive officers liable for "grossly and flagrantly unconstitutional" conduct, *see* 443 U.S. at 38, as we have done before, *see Leonard v. Robinson*, 477 F.3d 347, 358–59 (6th Cir. 2007). And while police-officer cases may raise some different concerns than the present one, we have never suggested that the qualified-immunity inquiry differs depending on the precise official at issue.

The plaintiffs wonder why Husted did not follow the lead of his predecessor, Secretary Brunner, who declined to enforce the residency requirement against initiative-petition circulators. One possible reason is that Brunner acted *after* our decision in *Nader* but *before* the Ohio General Assembly enacted the revised statute in 2013. *Nader* held the residency requirement "unconstitutional *as applied* to Ralph Nader" but also noted that our decision "ha[d] the same practical effect as a declaration" that the relevant provisions were "facially unconstitutional." 545 F.3d at 479 (Clay, J., opinion for the court) (emphasis added). Relying on this language, Brunner might have concluded that the statute was unconstitutional as applied to initiative-petition circulators, not just to presidential nominating-petition circulators. That conclusion was a reasonable one, and it was consistent with Brunner's oath-driven duty "to support" the National Constitution. U.S. Const. art. VI, cl. 3. But when the legislature enacted a more narrowly tailored statute in 2013, it was just as reasonable for Husted to conclude that he could enforce the new law without violating his own oath. Brunner's independent assessment of the law's constitutionality no more compels Husted to follow in her footsteps than it requires one judge to agree with another about a tricky constitutional question.

The plaintiffs conclude by arguing that Ohio's residency requirement is clearly unconstitutional under the Dormant Commerce Clause. But they do not point to a single case (nor have we found one) in which a court struck down a petition-circulator residency requirement under this clause. Far from being clearly established, the plaintiffs' rights under the Dormant Commerce Clause have not yet been established at all.

For these reasons, we reverse the district court's decision on qualified immunity, direct the court to grant summary judgment to Husted on the plaintiffs' money-damages claims, and remand for further proceedings consistent with this opinion.