NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0133n.06

Case No. 23-5608

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

JAZMINE BRYANT, as administratrix of the estate of Derrick J. Bryant, deceased,

    Plaintiff-Appellee,

v.

BILL D. HENSLEY; TIM RUCKER, et al.,

    Defendants,

ZACHARY HUNTER; TRACIE PAYNE,

    Defendant-Appellants.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

**FILED**
Mar 19, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

OPINION

</td></tr>
</table>

Before: SUTTON, Chief Judge; STRANCH and DAVIS, Circuit Judges.

SUTTON, Chief Judge. After spending nine days in a Boyd County Detention Center COVID-19 isolation cell, Derrick Bryant hanged himself. Bryant's estate sued the County and several correctional staff members under § 1983 and state law. The district court denied summary judgment to three defendants—Zachary Hunter, Tracie Payne, and Sergeant Timothy Rucker—holding that a jury could conclude that they were deliberately indifferent to Bryant's suicide risk with respect to the federal claim and acted in bad faith with respect to the state law claim. Just Hunter and Payne appeal. Because triable issues of fact remain over whether Hunter and Payne violated Bryant's right to medical treatment under federal and state law, we affirm.

I.

As this case comes to us, we must construe the evidence-supported facts in the light most favorable to the claimant. *Bays v. Montmorency County*, 874 F.3d 264, 268 (6th Cir. 2017). We thus accept the following facts as true.

Derrick Bryant violated his probation and missed court dates in three traffic-related cases. As a result, he entered the Boyd County Detention Center as a pretrial detainee on March 3, 2021. The County conducted an initial mental health screening and determined that Bryant did not present a heightened risk of suicide. At the time, Boyd County, like the rest of the country, faced the challenges of the COVID-19 pandemic. To slow the virus's spread, Boyd County required new entrants to spend their first 15 days in a small, isolated cell. Bryant was placed in one such cell with another person.

Three days into his detention, a nurse, Susan Scott, saw Bryant make jerking motions as if suffering a seizure. When a nearby jailer accused Bryant of faking, he stopped. Nurse Scott concluded that Bryant was not at risk of having a seizure.

A few days later, Bryant complained to jail staff that his "thoughts [would not] stop." R.48-2. Medical staff gave Bryant medication to lower his blood pressure, and he calmed down.

After nine days in the COVID-19 cell, jail staff observed Bryant "waving" and "screaming" at the camera in his cell. When Hunter, a deputy, and Sergeant Rucker came to check on him, Bryant "scream[ed], 'I just can't be in here. I can't stand it. I can't be in here.'" R.60 at 61. Jail staff prepared a chair with a restraining wrap, a device used for inmates on suicide watch, in case things got worse. As the officers prepared the wrap, Sergeant Rucker told Bryant that he could

not join the general jail population due to COVID-19 restrictions but offered to take Bryant outside if he would calm down. Bryant agreed, and Sergeant Rucker took him to a yard outside.

Once outside, Bryant began rolling around on the ground in a seizure-like way. Seeing this, Nurse Scott turned to Payne, a deputy, and said "he needs to go on [suicide] watch." *Id.* at 62–63. Nurse Scott walked over to Sergeant Rucker and Hunter and repeated that Bryant should be placed on suicide watch. Sergeant Rucker responded, "let's just get him up and take him to medical." *Id.* at 63–64. Because Bryant refused to walk, Sergeant Rucker and Hunter carried him while Bryant dragged his feet and laughed.

During the medical examination, Nurse Scott concluded that Bryant's seizures were fake but noted that there was "something psychological that [] needed [to be] monitored." *Id.* at 65–66. She said for a third time that they should "put him on suicide watch" to Sergeant Rucker and "all of those deputies," including Hunter and Payne. *Id.* at 66. Rather than follow this advice, Sergeant Rucker asked Bryant whether he wanted to go on suicide watch. Bryant responded that he did not.

Bryant returned to his cell. About an hour later, during a routine cell check, Bryant was found hanging from a bed sheet. He died later that night.

Bryant's estate filed an action under 42 U.S.C. § 1983 and state law, claiming that Boyd County and several of its employees violated his right to receive care for his serious medical needs. The district court granted summary judgment to Boyd County, Bill Hensley, and all of the defendants in their official capacities. But it denied summary judgment on the federal deliberate indifference claim and state bad faith claim against Sergeant Rucker, Deputy Hunter, and Deputy Payne in their individual capacities. Hunter and Payne appealed.

II.

*Federal law.* Qualified-immunity defenses to § 1983 actions involve two steps. We first determine whether the defendants violated the plaintiff's federal constitutional rights. *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016). If so, we decide whether those rights were clearly established. *Id.* In answering these questions, we view the evidence in the light most favorable to the claimant. *Raimey v. City of Niles*, 77 F.4th 441, 447 (6th Cir. 2023).

A.

The Due Process Clause of the Fourteenth Amendment gives pretrial detainees a right to adequate medical treatment. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020). A correctional officer violates this right when he acts with "'deliberate indifference' to a pretrial detainee's 'serious medical needs.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A claim of deliberate indifference has objective and subjective components. *Id.* The objective component requires the plaintiff to establish an objectively serious medical need, one with a "substantial risk of serious harm." *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)). The subjective component requires the plaintiff to show that the defendant "perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

Bryant's estate satisfied both requirements. Start with the objective component. Psychological distress may constitute a serious medical need, especially when it "result[s] in suicidal tendencies." *Horn ex rel. Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994); *see Troutman*, 979 F.3d at 482–83.

4

Bryant's words and actions over about two weeks showed psychological distress. He complained about uncontrollable thoughts. He repeatedly faked seizures, complained about his confinement in a small cell, and begged to leave his cell. Jail staff were concerned enough to prepare a chair and restraining wrap for him, a suicide prevention tool. Above all else, a nurse gave three warnings that Bryant should be placed on suicide watch. Taken together, these facts would permit a jury to conclude that Bryant's "alleged deprivation of medical care was serious enough to violate the [Constitution]." *Griffith v. Franklin County*, 975 F.3d 554, 567 (6th Cir. 2020) (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)).

Turn to the subjective component. It requires a plaintiff to show that the defendants knew about a significant likelihood of suicide, *Bays*, 874 F.3d at 268, and deliberately failed to take steps to prevent the detainee from taking his life, *Linden v. Washtenaw County*, 167 F. App'x 410, 416 (6th Cir. 2006); *Downard ex rel. Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020). A court (or jury) may "infer from circumstantial evidence that a prison official had the requisite knowledge." *Comstock*, 273 F.3d at 703 (discussing *Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994)). Specific warnings about an inmate's needs may serve as important circumstantial evidence. *See Clark-Murphy v. Foreback*, 439 F.3d 280, 287–89 (6th Cir. 2006) (finding that a correctional officer "perceived sufficient facts to infer that Clark faced serious risks to his health and safety" because he received an email warning him that the prisoner required "intense interventions"). In contrast, we have hesitated to say that a defendant subjectively perceived a risk when the defendant did not receive warnings about suicide or other serious medical needs. *See, e.g.*, *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 335–36 (6th Cir. 2013) (defendant did not perceive a likelihood of suicide when "no one told him that the decedent was suicidal" and he was "entitled to rely on the mental health staff's assessment" that the decedent did not "warrant[] a

5

suicide watch"); *Nallani v. Wayne County*, 665 F. App'x 498, 508 (6th Cir. 2016) (defendant did not perceive a likelihood of suicide where defendant did not receive any warning from medical professionals and the decedent denied feeling suicidal).

A jury could find that Hunter and Payne knew that Bryant posed a significant likelihood of suicide. Both saw Bryant fake a seizure in the outside yard. Payne witnessed Hunter help carry Bryant from the outside as he dragged his feet and laughed. And both of them, importantly, were present for two of Nurse Scott's three warnings that Bryant should be placed on suicide watch. These warnings show that Hunter and Payne had sufficient information to know that Bryant posed a significant suicide risk. *See Clark-Murphy*, 439 F.3d at 289.

A jury also could find that Hunter and Payne showed deliberate indifference to that risk. Given Nurse Scott's serial warnings, Hunter and Payne knew that Bryant posed a significant risk of suicide. Having received suicide-prevention training, they knew how to place a detainee with such symptoms on suicide watch. After witnessing Bryant's distress and after having it confirmed by medical personnel, Hunter and Payne were "under an obligation to offer medical care" to Bryant. *Comstock*, 273 F.3d at 702. Yet they failed to place Bryant on suicide watch, and indeed failed to take any action to protect him. On this record, there exists a genuine question of fact as to whether Hunter and Payne's decision to do nothing amounted to a deliberate disregard of Bryant's medical needs.

## B.

This constitutional right also was clearly established. "This circuit has consistently recognized a prisoner's established right to medical attention once the prisoner's suicidal tendencies are known." *Comstock*, 273 F.3d at 711; *see Perez v. Oakland County*, 466 F.3d 416, 428 (6th Cir. 2006) (noting that "once a prisoner has been deemed suicidal, it is clearly established

that the prisoner is entitled to continuing medical treatment"); *Bays*, 874 F.3d at 269; *Schultz v. Sillman*, 148 F. App'x 396, 404 (6th Cir. 2005). A reasonable officer in Hunter and Payne's position "would have clearly understood that [he or she] was under an affirmative duty to offer reasonable medical care to a prisoner whom he [or she] knew to be suicidal." *Comstock*, 273 F.3d at 711 (quotation omitted). On this record, qualified immunity does not apply.

C.

Hunter and Payne push back on this conclusion in several ways. They first claim forfeiture. After Hunter, Payne, and the other defendants moved for summary judgment, Bryant's estate filed a response arguing that qualified immunity did not apply. In Hunter and Payne's view, that response failed to argue that qualified immunity did not apply to them. True, Bryant's estate bears the burden of showing that qualified immunity does not apply. *See Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999). True also, the Estate's response focused more on the other defendants than on Hunter and Payne. But the response did discuss Hunter and Payne's actions leading up to Bryant's suicide. And it added that jail "staff" and "deputy jailers," which would include Hunter and Payne, were not protected by qualified immunity. R.63 at 12–13. No forfeiture occurred. *See Watkins v. Healy*, 986 F.3d 648, 666–67 (6th Cir. 2021).

The deputies next argue that Bryant's estate has at most shown a possibility of suicide, not the required "significant likelihood" of suicide. *Perez*, 466 F.3d at 425; *see also Downard*, 968 F.3d at 601 (stating the rule as a "strong" likelihood). Perhaps a jury will agree. But at summary judgment, we must confine our inquiry to whether a jury reasonably could find for Bryant's estate. Viewing the record in the light most favorable to the claimant, it shows that Hunter and Payne witnessed Bryant display signs of serious psychological distress and heard two warnings from a medical professional that Bryant needed to be placed on suicide watch. A reasonable jury could

conclude that Bryant showed a serious risk of suicide.

The same goes for the defendants' argument that their failure to act was, at most, negligent. A jury, once again, might agree. But on this evidence-supported record, a jury could reasonably find that Hunter and Payne perceived a strong likelihood of suicide and failed to take any steps to protect Bryant, despite being trained and having the power to place him on suicide watch. *See Heflin v. Stewart County*, 958 F.2d 709, 714–16 (6th Cir. 1992).

The deputies also claim that Bryant's constitutional right was not clearly established, insisting that any right to suicide-prevention measures applies only when the defendants subjectively perceive a suicide risk. But, as shown, a jury reasonably could find that Hunter and Payne knew that Bryant posed a significant suicide risk. *See Comstock*, 273 F.3d at 710–11.

It is true that *Helphenstine v. Lewis County*, 60 F.4th 305, 317 (6th Cir. 2023), and *Brawner v. Scott County*, 14 F.4th 585, 596 (6th Cir. 2021), which established that recklessness suffices to meet the subjective prong of the test, were decided after the unfortunate events in this case. But we have not relied on the recklessness standard here. Bryant's estate has established a material dispute of fact under either an actual-knowledge or recklessness standard.

### III.

*State law.* Bryant's estate also brought a state-law tort claim against the two deputies. Similar to federal law, Kentucky law protects government officials in making "good faith judgment calls [] in a legally uncertain environment." *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (quoting *Jefferson Cnty. Fiscal Ct. v. Peerce*, 132 S.W.3d 824, 833 (Ky. 2004)). An official does not receive protection if they acted in bad faith. *Id.*

Hunter and Payne argue that they should receive this protection because the estate failed to show "bad faith" on their part. We disagree. As the district court correctly recognized, the bad-

faith and deliberate-indifference inquiries contain overlapping components. The bad-faith inquiry turns on whether the defendants violated a "clearly established right which a person in the [defendants'] position presumptively would have known was afforded to a person in the plaintiff's position." *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001). We have already concluded that a jury could reasonably decide that Hunter and Payne violated a clearly established right and that they were deliberately indifferent to Bryant's plight when they refused to place him on suicide watch. It is not a large step to say that a triable issue of fact likewise exists over whether Hunter and Payne acted in bad faith under Kentucky law. *See Browning v. Edmonson County*, 18 F.4th 516, 530 (6th Cir. 2021) (holding that the defendant acted in bad faith and was "not eligible for state qualified immunity" under Kentucky law because he violated the plaintiff's "clearly established [federal] constitutional rights"); *King v. Taylor*, 694 F.3d 650, 665 (6th Cir. 2012) ("Just as [the] defense of qualified immunity on the federal claim requires a jury to resolve underlying disputed facts, so too with respect to [the] defense of qualified official immunity on plaintiffs' [state law tort] claim.").

We affirm.